FILED
2021 Mar-08  AM 10:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| JAMAL RASHAD WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| JEFFERSON S. DUNN; CHARLES | ) | |
| DANIELS; KARLA JONES; | ) | |
| GWENDOLYN GIVENS; ANTHONY | ) | |
| BROOKS; BRANDON BARLOW; | ) | |
| OFFICER JONES; and OFFICER | ) | JURY TRIAL DEMANDED |
| VALDEZ; | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff Jamal Rashad Wilson ("Plaintiff" or "Mr. Wilson"), by and through the undersigned counsel, and hereby files this Complaint against Commissioner Jefferson S. Dunn ("Dunn"); Associate Commissioner Charles Daniels ("Daniels"); Warden Karla Jones ("Warden Jones"); Assistant Warden Gwendolyn Givens ("Givens"); Assistant Warden Anthony Brooks ("Brooks"); Officer Brandon Barlow ("Barlow"); Officer Jones ("Officer Jones"); and Officer Valdez ("Officer Valdez"); (collectively, the "Defendants") and respectfully states the following allegations:

### INTRODUCTION

1.       For years, egregious levels of violence, high volumes of contraband, irresponsible housing assignments, inadequate security protocols, insufficient training, indifferent management, failures to design and implement corrective action plans, and general inattention to remedying known, recurring, and substantial risks of serious harm to people incarcerated at St. Clair

Correctional Facility in Saint Clair County, Alabama ("St. Clair") have resulted in preventable injuries and deaths.

2.      Defendants cannot assure any person's safety who is incarcerated at St. Clair.

3.      For example, Mr. Wilson was stabbed repeatedly while he slept in his own cell by a prisoner from another housing unit at St. Clair.

4.      The serious injuries Mr. Wilson suffered while incarcerated at St. Clair and the time, place, and manner in which he was injured evidence the Defendants' inability to keep any prisoner safe at St. Clair.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation of Mr. Wilson's rights secured by the U.S. Constitution.

6.      This Court has jurisdiction of Mr. Wilson's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claim pursuant to 28 U.S.C. § 1367.

7.      Venue is proper under 28 U.S.C. § 1391(b), as the majority of the Defendants reside in this judicial district and the events and omissions giving rise to Mr. Wilson's claims occurred within this judicial district.

## PARTIES

**A.      Plaintiff**

8.      Plaintiff Jamal Rashad Wilson is over the age of nineteen (19) years old and is imprisoned at St. Clair.

**B.      Defendants**

9.      Defendant Dunn became Commissioner of the Alabama Department of Corrections ("ADOC") in 2015 and was the Commissioner of the ADOC leading up to and during the events described in the Complaint.

a.      Mr. Wilson sues Defendant Dunn in his individual capacity. At all times relevant to this lawsuit, Defendant Dunn was acting under color of law and within the scope of his employment. Defendant Dunn is above the age of majority.

b.      As Commissioner, Defendant Dunn is the highest-ranking official in the ADOC and is responsible for the direction, supervision, and control of the ADOC.

c.      Defendant Dunn is ultimately responsible for policies at St. Clair, as he is for all the prisons in the ADOC system. Defendant Dunn is also ultimately responsible for ensuring that the practices at St. Clair conform to any applicable policies.

d.      Defendant Dunn has a duty to create, implement, enforce, and amend prison policies in order to ensure the safety of all prisoners, including that of Mr. Wilson.

e.      Defendant Dunn had a duty to ensure Mr. Wilson's safety at all times, including while he slept in his cell.

f.      Defendant Dunn's actions and failures to act created or perpetuated an unsafe environment at St. Clair in which:

i.      the P and Q blocks became "hot bays" (i.e., prison cell blocks that congregated individuals with behavior problems together in a single, general population housing unit where the prisoners lack programming opportunities and any regular correctional staff presence);

ii.      prisoners were allowed to move freely between cell blocks, including the P and Q blocks;

iii.      prisoners were allowed to obtain, fabricate, and possess weapons including knives and other dangerous, contraband instruments;

iv.      prisoners were permitted to access the cells of other prisoners

without authorization;

      v.     correctional officers routinely failed to verify that a prisoner sought entry into his assigned cell before buzzing the prisoner into the cell; and

      vi.    correctional officers failed to confirm that cell doors remained locked in accordance with applicable policies and appropriate practices.

      g.    Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of Defendant Dunn, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of Mr. Wilson's rights by his actions or by his deliberate indifference and failure to act.

10.    Defendant Daniels was the Associate Commissioner for Operations and Institutional Security for the ADOC leading up to and during the events described in the Complaint.

      a.    Mr. Wilson sues Defendant Daniels in his individual capacity. At all times relevant to this lawsuit, Defendant Daniels was acting under color of law and within the scope of his employment. Defendant Daniels is above the age of majority.

      b.    As Associate Commissioner for Operations and Institutional Security, Defendant Daniels was responsible for the direction, supervision, and control of the prison facilities operations. Defendant Daniels designed and retained responsibility for overseeing the implementation of policies and procedures for St. Clair, as he does for all the prisons in the ADOC system.

      c.    Defendant Daniels had a duty to create, implement, enforce, and amend

4

prison policy in order to ensure the safety of all prisoners, including that of Mr. Wilson.

d.      Defendant Daniels had a duty to ensure Mr. Wilson's safety at all times, including while he slept in his cell.

e.      Defendant Daniels's actions and failures to act created or perpetuated an unsafe environment at St. Clair in which:

i.      the P and Q blocks became hot bays through the assignment of a concentration of prisoners with documented propensities for violence to cells in those housing units;

ii.     prisoners were allowed to move freely between cell blocks, including the P and Q blocks;

iii.    prisoners were allowed to obtain, fabricate, and possess weapons including knives and other dangerous, contraband instruments;

iv.     prisoners were permitted to access the cells of other prisoners without authorization;

v.      correctional officers routinely failed to verify that a prisoner sought entry into his assigned cell before buzzing the prisoner into the cell; and

vi.     correctional officers failed to confirm that cell doors remained locked in accordance with applicable policies and appropriate practices.

f.      Defendant Daniels, in February 2019, issued a directive termed a "controlled movement directive," which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair.

g.      Defendant Daniels failed to ensure that the "controlled movement directive" was implemented or enforced at St. Clair, which proximately caused the constitutional

violations and other injuries complained of herein.

       h.    Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of Defendant Daniels, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act.

11.    Defendant Warden Jones was the Correctional Warden at St. Clair leading up to and during the events described in the Complaint.

       a.    Mr. Wilson sues Defendant Warden Jones in her individual capacity. At all times relevant to this lawsuit, Defendant Warden Jones was acting under color of law and within the scope of her employment. Defendant Warden Jones is above the age of majority.

       b.    Defendant Warden Jones was responsible for the day-to-day supervision of St. Clair, including but not limited to:

          i.    ensuring adequate staffing levels with appropriately trained personnel;

          ii.    ensuring adequate supervision and monitoring of prisoners, including their movements within and between cellblocks;

          iii.    implementing procedures for safely conducting prisoner counts, including the unlocking and re-locking of closed cell doors during such counts;

          iv.    implementing procedures for preventing prisoners from accessing the cells of other prisoners;

          v.    making decisions about housing assignments for prisoners,

particularly violent or dangerous prisoners; and

      vi.      allowing for the creation of designated or de facto hot bays at St. Clair.

      c.      Defendant Warden Jones had a duty to create, implement, enforce, and amend prison policy in order to ensure the safety of all prisoners, including that of Mr. Wilson.

      d.      Defendant Warden Jones had a duty to ensure Mr. Wilson's safety at all times, including while he slept in his cell.

      e.      Defendant Warden Jones's actions and failures to act created or perpetuated an unsafe environment at St. Clair in which:

      i.      the P and Q blocks became hot bays through the assignment of a concentration of prisoners with documented propensities for violence to cells in those housing units;

      ii.      prisoners were allowed to move freely between cell blocks, including the P and Q blocks;

      iii.      prisoners were allowed to obtain, fabricate, and possess weapons including knives and other dangerous, contraband instruments;

      iv.      prisoners were permitted to access the cells of other prisoners without authorization;

      v.      correctional officers routinely failed to verify that a prisoner sought entry into his assigned cell before buzzing the prisoner into the cell; and

      vi.      correctional officers failed to confirm that cell doors remained locked in accordance with applicable policies and appropriate practices.

f.    Defendant Warden Jones failed to implement or enforce the "controlled movement directive" issued by Defendant Daniels, which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair.

g.    Defendant Warden Jones's breaches of her duties proximately caused the constitutional violations and other injuries complained of herein.

h.    Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of Defendant Warden Jones, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by her actions or by her deliberate indifference and failure to act.

12.    Defendant Givens was one of the Assistant Correctional Wardens at St. Clair leading up to and during the events described in the Complaint.

a.    Mr. Wilson sues Defendant Givens in her individual capacity. At all times relevant to this lawsuit, Defendant Givens was acting under color of law and within the scope of her employment. Defendant Givens is above the age of majority.

b.    Defendant Givens was responsible for the day-to-day supervision of St. Clair, including but not limited to:

i.    ensuring adequate staffing levels with appropriately trained personnel;

ii.    ensuring adequate supervision and monitoring of prisoners, including their movements within and between cellblocks;

8

iii.     implementing procedures for safely conducting prisoner counts, including the unlocking and re-locking of closed cell doors during such counts;

iv.     implementing procedures for preventing prisoners from accessing the cells of other prisoners;

v.     making decisions about housing prisoners, particularly violent or dangerous prisoners; and

vi.     allowing for the creation of designated or de facto hot bays at St. Clair.

c.     Defendant Givens had a duty to create, implement, enforce, and amend prison policy in order to ensure the safety of all prisoners, including that of Mr. Wilson.

d.     Defendant Givens had a duty to ensure Mr. Wilson's safety at all times, including while he slept in his cell.

e.     Defendant Givens's actions and failures to act created or perpetuated an unsafe environment at St. Clair in which:

i.     the P and Q blocks became hot bays through the assignment of a concentration of prisoners with documented propensities for violence to cells in those housing units;

ii.     prisoners were allowed to move freely between cell blocks, including the P and Q blocks;

iii.     prisoners were allowed to obtain, fabricate, and possess weapons including knives and other dangerous, contraband instruments;

iv.     prisoners were permitted to access the cells of other prisoners without authorization;

v.      correctional officers routinely failed to verify that a prisoner sought entry into his assigned cell before buzzing the prisoner into the cell; and

vi.      correctional officers failed to confirm that cell doors remained locked in accordance with applicable policies and appropriate practices.

f.      Defendant Givens failed to implement or enforce the "controlled movement directive" issued by Defendant Daniels, which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair.

g.      Defendant Givens's breaches of her duties proximately caused the constitutional violations and other injuries complained of herein.

h.      Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of Defendant Givens, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by her actions or by her deliberate indifference and failure to act.

13.    Defendant Brooks was one of the Assistant Correctional Wardens at St. Clair leading up to and during the events described in the Complaint.

a.      Mr. Wilson sues Defendant Brooks in his individual capacity. At all times relevant to this lawsuit, Defendant Brooks was acting under color of law and within the scope of his employment. Defendant Brooks is above the age of majority.

b.      Defendant Brooks was responsible for the day-to-day supervision of St. Clair, including but not limited to:

10

i.      ensuring adequate staffing levels with appropriately trained personnel;

ii.     ensuring adequate supervision and monitoring of prisoners, including their movements within and between cellblocks;

iii.    implementing procedures for safely conducting prisoner counts, including the unlocking and re-locking of closed cell doors during such counts;

iv.     implementing procedures for preventing prisoners from accessing the cells of other prisoners;

v.      making decisions about housing prisoners, particularly violent or dangerous prisoners; and

vi.     allowing for the creation of official or de-facto hot bays at St. Clair.

c.      Defendant Brooks had a duty to create, implement, enforce, and amend prison policy in order to ensure the safety of all prisoners, including that of Mr. Wilson.

d.      Defendant Brooks had a duty to ensure Mr. Wilson's safety at all times, including while he slept in his cell.

e.      Defendant Brooks's actions and failures to act created or perpetuated an unsafe environment at St. Clair in which:

i.      the P and Q blocks became hot bays through the assignment of a concentration of prisoners with documented propensities for violence to cells in those housing units;

ii.     prisoners were allowed to move freely between cell blocks, including the P and Q blocks;

iii.    prisoners were allowed to obtain, fabricate, and possess weapons

including knives and other dangerous, contraband instruments;

      iv.      prisoners were permitted to access the cells of other prisoners without authorization;

      v.      correctional officers routinely failed to verify that a prisoner sought entry into his assigned cell before buzzing the prisoner into the cell; and

      vi.      correctional officers failed to confirm that cell doors remained locked in accordance with applicable policies and appropriate practices.

      f.      Defendant Brooks failed to implement or enforce the "controlled movement directive" issued by Defendant Daniels, which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair.

      g.      Defendant Brooks's breaches of his duties proximately caused the constitutional violations and other injuries complained of herein.

      h.      Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of Defendant Brooks, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act.

14.      Defendant Barlow was a correctional officer at St. Clair leading up to and during the events described in the Complaint. Specifically, Defendant Barlow was the "cube" officer on duty the evening that Mr. Wilson was attacked.

a.      Mr. Wilson sues Defendant Barlow in his individual capacity. At all times relevant to this lawsuit, Defendant Barlow was acting under color of law and within the scope of his employment. Defendant Barlow is above the age of majority.

b.      Defendant Barlow had a duty to ensure Mr. Wilson's safety at all times, including while he slept in his cell.

c.      Defendant Barlow breached his duty by, among other things:

    i.      failing to ensure that Mr. Wilson's cell door was re-locked after cell count;

    ii.      failing to ensure that Mr. Wilson's cell door was opened only by or for authorized personnel while Mr. Wilson slept;

    iii.      failing to ensure that prisoners from other blocks were not allowed access into Mr. Wilson's cell in the Q block while he slept;

    iv.      failing to ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block with a knife or other contraband weapon while Mr. Wilson slept; and

    v.      failing to ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block and attack him while he slept.

d.      Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of Defendant Barlow, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act.

13

15.     Defendant Officer Jones was a correctional officer at St. Clair leading up to and during the events described in the Complaint. Specifically, Defendant Officer Jones was one of the officers conducting the prisoner count in the Q block on the evening that Mr. Wilson was attacked.

a.     Mr. Wilson sues Defendant Officer Jones in his individual capacity. At all times relevant to this lawsuit, Defendant Officer Jones was acting under color of law and within the scope of his employment. Defendant Officer Jones is above the age of majority.

b.     When Mr. Wilson entered his cell to nap, he locked the door behind him. Around 6 P.M. that evening, while he was asleep, a correctional officer opened Mr. Wilson's cell door in order to perform the prisoner count. Subsequently, another prisoner—Ontario Javance Lawyer ("Mr. Lawyer")—was able to enter Mr. Wilson's unlocked cell and attack him while he slept.

c.     Only two possible explanations exist to account for how Mr. Lawyer was able to access Mr. Wilson's cell. One of these explanations is that—after performing the prisoner count—Defendants Officers Jones and Valdez failed to lock Mr. Wilson's cell door.

d.     Defendant Officer Jones had a duty to ensure Mr. Wilson's safety at all times, including while he slept in his cell.

e.     Defendant Officer Jones breached his duty by, among other things:

i.     failing to ensure that Mr. Wilson's cell door was re-locked after conducting a prisoner count;

ii.     failing to ensure that Mr. Wilson's cell door was opened only by or for authorized personnel while Mr. Wilson slept;

iii.      failing to ensure that prisoners from other blocks were not allowed access into Mr. Wilson's cell in the Q block while he slept;

iv.      failing to ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block with a knife or other contraband weapon while Mr. Wilson slept; and

v.      failing to ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block and attack him while he slept.

16.      Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of Defendant Officer Jones, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act.

17.      Defendant Officer Valdez was a correctional officer at St. Clair leading up to and during the events described in the Complaint. Specifically, Defendant Officer Valdez was one of the officers conducting the prisoner count in the Q block on the evening that Mr. Wilson was attacked.

a.      Mr. Wilson sues Defendant Officer Valdez in his individual capacity. At all times relevant to this lawsuit, Defendant Officer Valdez was acting under color of law and within the scope of his employment. Defendant Officer Valdez is above the age of majority.

b.      When Mr. Wilson entered his cell to nap, he locked the door behind him. Around 6 P.M. that evening, while he was asleep, a correctional officer opened Mr. Wilson's cell door in order to perform the prisoner count. Subsequently, Mr. Lawyer was able to enter Mr. Wilson's unlocked cell and attack him while he slept.

c.      Only two possible explanations exist to account for how Mr. Lawyer was able to access Mr. Wilson's cell. One of these explanations is that—after performing the prisoner count—Defendants Officers Jones and Valdez failed to lock Mr. Wilson's cell door.

d.      Defendant Officer Valdez had a duty to ensure Mr. Wilson's safety at all times, including while he slept in his cell.

e.      Defendant Officer Valdez breached his duty by, among other things:

i.      failing to ensure that Mr. Wilson's cell door was re-locked after conducting the prisoner count;

ii.      failing to ensure that Mr. Wilson's cell door was opened only by or for authorized personnel while Mr. Wilson slept;

iii.      failing to ensure that prisoners from other blocks were not allowed access into Mr. Wilson's cell in the Q block while he slept;

iv.      failing to ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block with a knife or other contraband weapon while Mr. Wilson slept; and

v.      failing to ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block and attack him while he slept.

18.     Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of Defendant Officer Valdez, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act.

## FACTUAL BACKGROUND

**A.    The Hot Bays—St. Clair's P and Q Blocks**

19.    In late 2017, Mr. Wilson was transferred to St. Clair.

20.    St. Clair is a maximum-security (Level V) prison, where beatings, stabbings, and rapes had become routine and much of the prisoner population possessed contraband weapons to either perpetrate violence or defend against threats of violence.

21.    From the time he arrived at St. Clair to the time he was stabbed in March 2019, Mr. Wilson was housed in the Q block.

22.    Pursuant to policy or practice, ADOC and St. Clair administration implemented a hot bay dorm management system for the P block and the adjacent Q block. Under this system, ADOC and St. Clair management housed individuals with behavior problems together in general population in the P and Q blocks where prisoners lack programming opportunities and an adequate presence of correctional officers.

23.    Predictably, the rates of violence were even higher in the P and Q blocks than in the other prison blocks due to the hot bay dorm management system.

**B.    The attack and stabbing of Jamal Wilson**

24.    On March 6, 2019, around 3:00 p.m. or 4:00 p.m., Mr. Wilson went to his cell in Q block to take a nap. Mr. Wilson was assigned to a double cell and had a cellmate.

25.    In order to have the cell door opened, Mr. Wilson attracted the attention of the correctional officer stationed in the "cube"—an elevated guard station that overlooks some, but not all, of the cell doors. The officer in the cube remotely unlocked Mr. Wilson's cell door to allow him inside.

26.    Mr. Wilson entered his cell, which was unoccupied, and then closed the cell door and confirmed that it was locked behind him. Shortly thereafter, Mr. Wilson fell asleep.

27.     Around 6:00 p.m., correctional officers performed a regularly scheduled shift change and prisoner count. Defendant Barlow was the "cube" officer during the prisoner count and Defendants Officers Jones and Valdez conducted the count.

28.     Mr. Wilson remained asleep during the shift change and prisoner count. However, according to Mr. Wilson's previous observations, the procedure for the prisoner count required that the "cube" officer remotely unlock cell doors to allow the correctional officers conducting the count to enter each cell and count the prisoners inside.

29.     Additionally, prison procedures dictate that the correctional officers leave the cell door as they found it (locked or unlocked). Accordingly, Defendants Officers Jones and Valdez should have locked Mr. Wilson's cell door after leaving the cell.

30.     Around 7:00 p.m., a prisoner from the adjacent P block—Mr. Lawyer—gained unauthorized access to Mr. Wilson's cell. Because Mr. Wilson locked his cell door behind him, the only possible explanation for how Mr. Lawyer was able to enter the cell are: (1) Defendants Officers Jones and Valdez failed to lock Mr. Wilson's cell after conducting the prisoner count; or (2) Defendant Barlow "buzzed" Mr. Lawyer into the cell (i.e., remotely unlocked the door to allow access to the cell).

31.     Mr. Wilson awoke in his assigned cell to Mr. Lawyer viciously assaulting him.

32.     Mr. Lawyer first stabbed Mr. Wilson in the face in the left cheek. The attack awakened Mr. Wilson, who instinctively covered himself to protect from further injury. Still, Mr. Lawyer was able to stab Mr. Wilson nine additional times in the body and inflict trauma resulting in fractures to the skull, nose and maxillary sinus.

33.     After the attack, Mr. Lawyer walked out of Mr. Wilson's cell and told a nearby prisoner "Go get him before he dies."

34.     Mr. Wilson was seriously injured in the attack and suffered multiple deep stab wounds to his face and right and left arms requiring sutures, a fractured skull and nose and a maxillary sinus fracture.

35.     Despite his injuries, Mr. Wilson managed to crawl out of his cell to call for help. Because correctional officers were not on-site, fellow prisoners moved him into the cellblock and attended to Mr. Wilson until correctional officers arrived.

36.     After the correctional officers could not start the motorized cart to transport Mr. Wilson to the infirmary, prisoners carried Mr. Wilson there to receive medical attention. Mr. Wilson was then transported to a nearby hospital for treatment of his severe injuries. Two days later, Mr. Wilson was discharged from the hospital to the prison infirmary.

37.     Because of Mr. Lawyer's attack in March 2019, Mr. Wilson has multiple scars from the stabbing and suffers from anxiety and constant fear for his safety.

**C.     The Institutional Failures that Allowed the Attacks to Occur**

38.     Mr. Wilson, like so many other prisoners in the Alabama prison system, was a victim of preventable violence committed by a fellow prisoner. These attacks have been allowed to occur by the continuous and systematic failings of the Defendants to protect prisoners in their care.

*i.     Department of Justice investigation and lawsuit*

39.     Prior to the March 2019 attack on Mr. Wilson, the unconstitutionally dangerous conditions in Alabama's men's prisons had already attracted attention from the federal government. In October 2016, the United States Department of Justice's ("DOJ") Civil Rights Division opened an investigation into the conditions at the ADOC's male prison facilities. *See* **Exhibit A** at p. 3, DOJ, *Investigation of Alabama's State Prisons for Men*, dated April 2, 2019 (the

"DOJ Report").[1] The DOJ published its findings in a report and issued a notice to the State of Alabama and the ADOC on April 2, 2019.

40.     Ultimately, the DOJ's investigation found that "[t]here is reasonable cause to believe that the [ADOC] has violated and is continuing to violate the Eighth Amendment rights of prisoners housed in men's prisons by failing to protect them from prisoner-on-prisoner violence . . . and by failing to provide safe conditions." Ex. A at p. 1. The DOJ further stated that "[t]he violations are severe, systemic, and exacerbated by serious deficiencies in staffing and supervision; overcrowding; ineffective housing and classification protocols; inadequate incident reporting; inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons; ineffective prison management and training; insufficient maintenance and cleaning of facilities; the use of segregation and solitary confinement to both punish and protect victims of violence and/or sexual abuse; and a high level of violence that is too common, cruel, of an unusual nature, and pervasive." Ex. A at pp. 1–2.

41.     After publishing the DOJ Report, the DOJ engaged in negotiations with Alabama to remedy the unconstitutionally dangerous conditions in its prisons. *See* **Exhibit B** at ¶ 3, Compl., filed Dec. 9, 2020, *U.S. v. State of Ala. and Ala. Dep't of Corrections*, Civ. No. 2:20-cv-01971 (N.D. Ala.). However, the DOJ determined that "the State of Alabama has failed or refused to correct the unconstitutional conditions in Alabama's prisons for men." *Id.* As a result, on December 9, 2020, the DOJ initiated a lawsuit against Alabama and the ADOC (the "DOJ Lawsuit"). *See* Ex. B.

---

[1] Exhibit A is attached to this Complaint and incorporated by reference as if fully set forth herein.

ii.  *The security crisis at St. Clair*

42.    As a result of the DOJ's investigation, prisoner litigation, and on-the-ground experience at St. Clair, Defendants were on notice of a serious security crisis at St. Clair in which prison beatings, stabbings, and rapes were endemic, particularly in the P and Q blocks.

43.    For example, in the months leading up to the assault on Mr. Wilson, at least four men were killed as a result of assaults that took place in whole or in part in the P and Q blocks at St. Clair: Terrence Andrews, Travis Wilson, Terry Pettiway, and Rogarius Bray.

44.    This egregious level of violence at St. Clair had its genesis in 2010, when the number of assaults at that prison began to increase sharply.

45.    In fiscal year 2010, the number of reported assaults at St. Clair was just 23.

46.    Then, the number of reported assaults grew at an astonishing rate:

| Fiscal Year | Assaults |
| --- | --- |
| 2011 | 59 |
| 2012 | 78 |
| 2013 | 101 |
| 2014 | 127 |
| 2015 | 157 |
| 2016 | 249 |
| 2017 | 132 |
| 2018 | 163 |

47.    The rate of assaults at St. Clair far exceeded typical levels of violence at comparable facilities across the nation.

48.     Listed below are but some of the assaults at St. Clair in general, and in the P and Q blocks in particular, in the two years preceding the attack on Mr. Wilson.

49.     January 2017:

- A prisoner was assaulted by two men in a day room in Q-block within sight of the warden. The prisoner was stabbed in the left temple.

50.     February 2017:

- A prisoner was stabbed nine times by three prisoners who came into his cell and attacked him.

51.     March 2017:

- A prisoner was raped and later found by officers tied to a chair and beaten.
- At least four other prisoners were stabbed.

52.     April 2017:

- Two men were hospitalized with stab wounds after a knife fight.
- A stabbing attack left a prisoner in a coma.

53.     May 2017:

- A large violent incident occurred in which fifteen prisoners were stabbed.
- A prisoner suffered a broken jaw when he was assaulted by another prisoner who used a lock placed in a sock in the assault.

54.     July 2017:

- A prisoner at St. Clair was found dead by staff with his hands tied to a bedpost, with clear strangulation marks on his neck.
- A prisoner was killed in a violent attack.
- A prisoner was stabbed in the neck.

- A prisoner was stabbed in his sleep.

- A prisoner told officers that he was unsafe in Q block and was being extorted, prompting staff to order him to return to Q block, where he was held hostage, raped, and stabbed.

- A violent incident in Q-block resulted in the stabbing of four prisoners.

- A knife fight occurred in P-block and officers witnessed the fight but did nothing to intervene.

- One prisoner stabbed at least five people in three separate incidents.

55.     August 2017:

- A prisoner was stabbed in his own cell after confronting another prisoner about stealing his property.

- A prisoner was stabbed near the cubicle in block P-2 by a prisoner who was intoxicated on crystal methamphetamine.

- A prisoner was stabbed thirteen times in block P-1 shortly after being released from segregation.

- Another prisoner was stabbed in block P-1.

56.     September 2017:

- A prisoner was found under his bed in the Q block with multiple stab wounds.

- A prisoner at St. Clair was raped.

- A prisoner was stabbed by a known enemy, in a fight that lasted for over twenty minutes before anyone intervened.

- Four prisoners were involved in a fight with box cutters and knives.

- A knife fight in the G-Yard involved at least six prisoners.

57.   October 2017:

- A prisoner was sexually assaulted in the P/Q barbershop after he had passed out.

- A prisoner was sexually assaulted in the Q block at knifepoint.

- A prisoner took another prisoner hostage in his cell and assaulted him over a period of two days.

- A prisoner was sexually assaulted in the H dorm.

- Officers observed a prisoner walk into the yard wearing only a blanket and socks, after he had been severely beaten and burned on his face.

- A prisoner in segregation was stabbed in his sleep when the cube officer left his cubicle with the door open.

- Three additional prisoners were stabbed in two separate incidents.

- Another prisoner slit a prisoner's throat in the O-block after improperly gaining access to the housing unit.

58.   November 2017:

- A prisoner was held hostage and sexually assaulted over three days by four prisoners in Q block. The prisoner had recently been released from segregation.

- A prisoner was raped at knifepoint.

- A prisoner stabbed another prisoner who was being escorted by two correctional officers, and then was allowed to escape without recovery of the knife.

24

- A prisoner stabbed another prisoner who was trying to sexually assault him.

- Two prisoners fought with large machete-type knives in the dining area and then out onto the G block yard, while three officers watched but did not intervene.

59. December 2017:

- Two prisoners were sexually assaulted, one at knifepoint.

- A prisoner was stabbed sixteen times in front of the P/Q block.

- A prisoner was stabbed in his back, knees, and legs while helping another prisoner move his belongings into the Q block.

- A prisoner was stabbed twelve times in the arm, side, and back in the H block, in view of an officer who was nearby but did not intervene.

- A prisoner was robbed and assaulted in the N/O blocks.

- A prisoner was stabbed four times.

- A transgender prisoner was assaulted by a prisoner wielding a metal pole.

60. January 2018:

- A prisoner was sexually assaulted at knifepoint in the O block. The assailant had previously been reported as the assailant in a number of sexual assaults at St. Clair.

- A prisoner was stabbed repeatedly in his cell in O block by prisoners carrying out a robbery.

- Starting in January 2018 and lasting through June 2018, a prisoner was repeatedly raped by a group of individuals who said he owed them a debt.

The rapes occurred on a near daily basis, and officers were aware of the situation but did nothing to intervene.

61.   February 2018:

- A prisoner was stabbed repeatedly in Q block.

- Another prisoner was killed in a knife fight at St. Clair by a prisoner with an extensive history of being disciplined for possession of knives.

- A prisoner was stabbed in the back of the head near the P/Q blocks right after being released from segregation.

- Another prisoner was stabbed in the P/Q blocks.

- A prisoner at St. Clair was repeatedly physically and sexually assaulted over the course of several days by his cellmate, who was also extorting him.

- A handcuffed prisoner was stabbed in segregation when another prisoner escaped from his own handcuffs.

- Another prisoner was stabbed in the G dorm.

62.   March 2018:

- A prisoner was stabbed in the P/Q blocks while the prison was on lockdown, and the knife was still embedded in his body when he emerged from the block.

- A prisoner was sexually assaulted multiple times during his first month at St. Clair.

- A prisoner was stabbed in the chest at the doorway to the Q block.

- A prisoner was stabbed in the leg during an attempted robbery in the gym.

- At least five other stabbing incidents occurred.

63.     April 2018:

- A prisoner was kidnapped and raped in the Q block.

- A knife fight in the P block resulted in a prisoner being stabbed thirteen times, including in the chest and head.

- A prisoner was threatened with rape by two men armed with knives, and was only able to gain the attention of correctional officers by cutting his wrists with a razor blade so that he could report what happened to a mental health officer.

- A prisoner was stabbed in front of the gym by a prisoner who had recently been released from segregation.

64.     May 2018:

- A prisoner was held hostage by four other prisoners and sexually assaulted him. During the two days, officers did not enter the cell and simply asked how many men were inside when they conducted counts. The victim did not press charges after an investigator told him reporting would put his life in danger and promised that he would be transferred if he did not report.

- A prisoner was stabbed in his sleep in his cell in the Q block.

- A prisoner was sexually assaulted at knifepoint by another prisoner.

- A prisoner was stabbed and beaten outside the doorway to the L/M blocks.

- A prisoner was stabbed seven times in the G block yard.

- A prisoner was stabbed in front of officers on his way to a GED class.

- A prisoner was held in a cell and beaten with a wooden paddle.

- A prisoner was stabbed a group of prisoners outside the entry to the Q block. The apparent motive for the attack was that the assailants had seen a document suggesting that the prisoner had provided staff with information related to a prior stabbing.

65. June 2018:

- A prisoner was sexually assaulted in the P block. When he reported the rape to correctional officers, he was told that they "did not care."

66. July 2018:

- Three prisoners physically assaulted and attempted to sexually assault another prisoner who returned to the P block following a prior sexual assault. The group of prisoners locked him in a cell and beat him with a belt buckle.

- A prisoner was stabbed by his cellmate and several other prisoners because he refused to move out of his cell in the P block.

- A prisoner was stabbed in his sleep in his cell in the Q block.

- Another prisoner was stabbed in the Q block.

- Another prisoner was stabbed in his cell in the Q block after confronting other prisoners about taking his belongings.

- A prisoner taped knives to both his hands and repeatedly stabbed yet another prisoner in the Q block.

- Another prisoner was stabbed in the P/Q block hallway.

- Another prisoner was stabbed on the porch of the P/Q block.

28

- A robbery resulted in the stabbing of another prisoner, who passed out from blood loss.

- A prisoner slit the throat of another prisoner with a razor in the common area of the A block in an attack that was witnessed by a correctional officer who did not intervene.

67.    August 2018:

- A prisoner was sexually assaulted within a week of his arrival at St. Clair.

- A prisoner was stabbed over twenty times by a group of prisoners in the P/Q hallway in plain view of the "cube" officer who observed the incident but did not intervene.

- A prisoner was stabbed over ten times in the Q block in relation to a debt.

- A prisoner was given a drink laced with a substance that caused him to lose consciousness and was then stabbed by several prisoners in the P-2 dayroom while he was unconscious. The victim was left bleeding for about 30 minutes while other prisoners tried to get help from officers who refused to intervene.

- A prisoner was stabbed through the tray hole in his cell in the B block by a prisoner who was working as a segregation runner.

- At least six other separate incidents occurred in which prisoners were stabbed.

68.    September 2018:

- A prisoner was stabbed to death at St. Clair. The prisoner had previously been stabbed at St. Clair in July 2017.

29

- A prisoner was stabbed in his bed in H dorm by an intoxicated prisoner, who was then attacked and stabbed by another group of prisoners.

- A prisoner was stabbed in the stomach and the leg, and forced to attempt to sew up the lacerations himself, which eventually became infected.

69. October 2018:

- A prisoner was stabbed by several men in a cell in Q block.

- A prisoner was sexually assaulted in the P block at knifepoint.

- A prisoner was stabbed in the throat while in segregation.

70. November 2018:

- A prisoner was stabbed in the P/Q block by an intoxicated prisoner who was acting erratically before the assault.

- A prisoner was stabbed in the H dorm.

71. December 2018:

- A prisoner was stabbed and killed by another prisoner in an altercation that took place in part in the P/Q block.

- A robbery resulted in prisoner being stabbed in Q block.

- A group of prisoners assaulted and threatened to stab prisoner who had just been released from restricted housing. Because the prisoner would not identify his attackers, he was written up by staff for creating a safety and security hazard.

iii. *Defendants were aware of the security crisis at St. Clair and the resulting substantial risk of serious harm to Mr. Wilson*

72. Defendants had knowledge of the substantial risk of serious harm facing prisoners such as Mr. Wilson at St. Clair—particularly in the P and Q blocks—based on incident reports for

the above-identified assaults, as well reports by the ADOC Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, or prisoner lawsuits.

73.     ADOC's publicly available reports in the timeframe leading up to the first assault of Mr. Wilson at St. Clair also reflect that injuries, deaths, and fighting were a systemic problem at St. Clair.

74.     Nonetheless, Defendants failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners such as Mr. Wilson at St. Clair.

75.     In 2014, a security audit of St. Clair was conducted. Grantt Culliver, a former ADOC Associate Commissioner and Correctional Emergency Response Team Commander, admitted that, to his knowledge, no corrective action plan of any kind was developed in response to the audit.

76.     In October 2014, following an alarming number of violent attacks and murders at St. Clair, the Equal Justice Initiative ("EJI") filed a class action lawsuit on behalf of St. Clair prisoners seeking injunctive relief to reduce the violence at St. Clair. See **Exhibit C**, Class Action Compl., filed Oct. 14, 2014, *Cheatham et al. v. Thomas et al.*; Civ. Act. No. 4:14-cv-01952-VEH (N.D. Ala.) (the "*Cheatham* Complaint").

77.     The *Cheatham* Complaint also described the policies and practices fueling the outbreak of violence at St. Clair, including inadequate supervision and monitoring of the facility, failure to address the widespread proliferation of contraband weapons at the facility, creation of a dangerous culture of violence and abuse, and failure to respond appropriately to violence and rape.

78.     Defendant Dunn received notice of the allegations in the *Cheatham* Complaint and became a defendant in the action when he took over as ADOC Commissioner in January 2015.

79.     In the aftermath of the *Cheatham* lawsuit, Defendants again failed to take reasonable, necessary, and appropriate steps to remedy the dangerous conditions at St. Clair.

80.     The violence at St. Clair continued to escalate.

81.     In October 2016, the DOJ opened an investigation into whether the conditions in Alabama's prisons for men violated the Eighth Amendment of the U.S. Constitution. The DOJ investigation included inquiries into whether ADOC adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners and provides prisoners with safe living conditions.

82.     Defendants received notice of the DOJ investigation.

83.     Again, Defendants failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair. Ex. B at ¶ 3.

84.     The *Cheatham* case settled in November 2017, with the ADOC agreeing to:

a.     Implement an internal classification system to protect prisoners and staff by identifying risks and needs, rather than randomly assigning people to beds;

b.     Create an incident management system that would allow the prison to prevent, track, and respond to violent incidents;

c.     Replace faulty locks and install surveillance cameras; and

d.     Create a transitional unit for prisoners released from segregation, among other things. *See* Equal Justice Initiative, *Alabama Department of Corrections Agrees to Reforms at St. Clair Prison in Response to EJI Lawsuit*, Nov. 8, 2017, https://eji.org/news/alabama-settles-eji-lawsuit-on-st-clair-prison/.

85.     Defendants were on notice of the settlement agreement in *Cheatham*.

86.     Once more, however, Defendants failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair in response.

87.     In June 2018, EJI notified the ADOC (including Defendant Dunn) that ADOC had failed to implement the necessary reforms and comply with the settlement agreement.

88.     At the time of the March 2019 assault on Mr. Wilson at St. Clair, the majority (if not all) of the unconstitutional policies and practices identified in the *Cheatham* litigation continued at St. Clair despite the *Cheatham* litigation and settlement.

89.     In a letter dated September 6, 2018, just six months before the March 2019 assault on Mr. Wilson at St. Clair, EJI notified Defendant Dunn of a rise of a "concerning increase in serious incidents of violence" at St. Clair.

90.     EJI warned in its letter specifically about the dangers of St. Clair's "'hot bay' dorm management policy that houses individuals with behavior problems together in a single housing unit in general population where they lack programming opportunities and any regular security staff presence" and that "the last two homicides [of Travis Wilson and Terry Pettiway] are a manifestation of the safety problems this kind of management technique creates."

91.     EJI also warned Defendant Dunn in its letter that "weapons contraband continues to saturate the prison and continues to contribute to serious incidents of violence at St. Clair," and that "contraband searches continue to be sporadic and ineffectual."

92.     EJI further noted in its letter: "Nationally recognized experts who have reviewed operations at St. Clair have recommended specific, detailed steps that are necessary to the detection and elimination of contraband at the facility," including "to completely lock-down the facility 'for several days' and 'conduct a thorough unannounced shake down of all areas including living areas and administrative or program areas before releasing prisoners,'" as the "first step in creating a

'sterile' environment," to be followed by a "regular, routine and effective practice of searching the prison."

93.     However, Defendants again failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair following receipt of this letter.

94.     The violence at St. Clair continued unabated.

95.     In response, prisoners filed individual lawsuits that described the dangerous conditions at St. Clair, such prevalent stabbings and sexual violence, a failure of institutional controls, inadequate supervision, inadequate prisoner monitoring, inadequate contraband searches, and inadequate sexual assault policies at the prison.[2]

96.     Defendant Dunn, in fact, was named as a defendant in these lawsuits, served with the lawsuits, and provided with notice of the allegations therein, in which he was accused of having failed to protect prisoners from physical and sexual violence at St. Clair in 2014 and 2015. Defendant Dunn was deposed in the lawsuits and confronted with evidence of systematic failures to protect prisoners at St. Clair from prisoner-on-prisoner beatings, stabbings, and sexual violence. Defendant Dunn's deposition occurred in November 2018, just months before Mr. Wilson's assault.

97.     Nonetheless, Defendants did not take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners such as Mr. Wilson at St. Clair.

98.     On February 28, 2019, after the stabbing death of Steven Mullins—a prisoner in St. Clair's Q block—Defendants Daniels and Warden Jones discussed a corrective action plan for the P and Q blocks. A few days later, Defendant Daniels transmitted the plan—the "controlled

---

[2] These complaints include: Complaint, Dkt. 1, *McGregor v. Thomas, et al.*, Case 4:17-cv-00593 (N.D. Ala. Apr. 12, 2017); Amended Complaint, Dkt. 11, *Miller v. Dunn, et al.*, Case 4:17-cv-00180 (N.D. Ala. Mar. 28, 2017); and Complaint, Dkt. 1, *Townsel v. Thomas, et al.*, Case 4:17-cv-00516 (N.D. Ala. Mar. 31, 2017).

movement directive"—to Defendant Warden Jones. The plan called for heightened supervision of the P and Q blocks and significant restrictions on prisoner movement within their respective blocks.

99.     The plan was never properly implemented, however. St. Clair Correctional Warden Errol Pickens, who was posted to St. Clair in April 2019, stated that the directive had already been abandoned before his arrival. In fact, Defendants Dunn, Daniels, and Warden Jones's oversight of and commitment to the plan's implementation was so poor that a St. Clair correctional officer sergeant was forced to circumvent the chain of command and directly bring the matter to the attention of the ADOC's senior leadership. As a result, Mr. Wilson's assailant was free to leave his cell in the P block, enter the Q block, and, ultimately, gain access to Mr. Wilson's cell.

100.     Following its investigation, the DOJ issued extensive Notice Letters to the ADOC in April 2019 and July 2020 outlining the ADOC's continued failure to protect its prisoners. This investigation was based on significant amounts of data collected from the ADOC—nearly all of it pre-dating the attack on Mr. Wilson and of which Defendants were on notice.[3]

101.     The April 2019 Notice Letter, for example, confirmed for Defendants that the ADOC unlawfully permitted violations of the Eighth Amendment rights of prisoners by failing to prevent prisoner-on-prisoner violence and sexual abuse and failing to provide safe conditions.

102.     The April 2019 Notice Letter went on to conclude that the constitutional "violations are severe, systematic, and exacerbated by serious deficiencies" including those in "ineffective housing and classification protocols"; "inadequate incident reporting"; "inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons"; "ineffective

---

[3] U.S. Dept. of Justice, *Re: Notice Regarding Investigation of Alabama's State Prisons for Men*, Apr. 2, 2019, https://www.justice.gov/opa/press-release/file/1150276/download; U.S. Dept. of Justice, *Investigation of Alabama's State Prisons for Men*, July 23, 2020, https://www.justice.gov/crt/case-document/file/1297031/download.

prison management and training"; "the use of segregation and solitary confinement to both punish and protect victims of violence and/or sexual abuse"; and "a high level of violence that is too common, cruel, of an unusual nature, and pervasive." And further, the DOJ found that "an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."

103.    The violence at St. Clair continued unabated, and the DOJ filed a lawsuit on December 9, 2020. *See* Ex. B.

104.    Despite having notice of the substantial risk of serious harm facing prisoners at St. Clair in the time leading up to Mr. Wilson's assault, Defendants continued to fail to take reasonable steps to address and reduce the risk of violence to prisoners.

**D.    Defendants' Specific Failures Leading Up to the Attack**

105.    The environment of unchecked violence was allowed to persist at St. Clair due to Defendants' failures to meaningfully address the issue. On March 6, 2019, these conditions directly resulted in serious physical and emotional injury to Mr. Wilson.

    *i.    Failure to Secure Mr. Wilson's Cell*

106.    After entering his cell to nap, Mr. Wilson closed and locked his cell door behind him. However, several hours later, Mr. Wilson awoke to a vicious stabbing attack perpetrated by a prisoner who should not have had access to Mr. Wilson's cell.

107.    Two possibilities exist for how Mr. Wilson's assailant was permitted to access his cell.

108.    Either Defendants Officers Jones and Valdez failed to secure Mr. Wilson's cell door after conducting the prisoner count or Defendant Barlow opened Mr. Wilson's cell door to allow Mr. Lawyer to access the cell.

109.    Defendants took no meaningful steps to address the substantial risk of serious harm to prisoners in the P and Q blocks that would result from failing to secure prisoner cells from unauthorized access.

110.    Defendants acted with deliberate indifference to prisoner safety by failing to implement policies and procedures that ensured that cell doors were locked when occupied and that prisoners could not access other prisoners' cells.

ii.    _Failure to Provide Adequate Supervision and Monitoring_

111.    Defendants, through their acts and omissions, failed to provide adequate supervision and monitoring of prisoners housed within St. Clair—particularly in the P and Q blocks—to prevent violence.

112.    As set forth above, at the time of Mr. Wilson's assault at St. Clair in March 2019, the P and Q blocks at St. Clair had long been subject to staggering levels of prisoner-on-prisoner violence.

113.    This was a predictable result, as a large proportion of the prisoners housed in the P and Q blocks had disciplinary problems and histories of violence while in ADOC custody.

114.    This hot bay policy effectively grouped together those prisoners with the highest propensity for violence.

115.    Despite this, the supervision in this area was virtually non-existent.

116.    Most of the time, a single cube officer was the only officer monitoring the entire area of the P and Q blocks.

117.    The "cube" officers generally did not leave their cubicles.

118.    Often, the "cube" officers had not even undergone basic correctional officer training.

119.    The officers in the "cube" were, at times, absent, asleep, on the telephone, or otherwise not paying attention to the prisoners they were charged with monitoring.

120.    Random patrols of the P and Q blocks by additional officers occurred extremely infrequently.

121.    Due to lax supervision, correctional staff at St. Clair often failed to observe violent incidents and only discovered the victim after the violence and/or injuries had occurred.

122.    Due to lax supervision, correctional staff at St. Clair sometimes watched violent or troubling incidents unfold without intervening.

123.    The P and Q blocks also lacked adequate surveillance cameras to monitor the housing units.

124.    Blind spots on the units, in concert with inadequate staff presence, officer inattentiveness, and the lack of surveillance equipment, created a further substantial risk of serious harm to prisoners such as Mr. Wilson and had contributed to numerous violent incidents in the years leading up to the attack on Mr. Wilson.

125.    Exacerbating these problems was the absence of emergency call buttons in the cells to summon assistance from staff.

126.    Defendants were aware of the particular dangerousness of the P and Q blocks, the high proportion of prisoners housed there with disciplinary problems and histories of violence while in ADOC custody, the lack of adequate monitoring of prisoners in the P and Q blocks, the acute inattentiveness of officers stationed there, the proliferation of contraband weapons, the lack of cameras, and the existence of blind spots in the P and Q blocks at St. Clair.

127.    Defendants were also aware that when prisoners were in a cell, they had no way of contacting a security officer other than banging on their cell doors or shouting— wholly ineffective

means for getting help because security officers were frequently asleep, inattentive, absent, or otherwise out of earshot.

128.    Defendants were likewise aware that the resulting inadequate supervision and monitoring of prisoners created a substantial risk of serious harm that facilitated and encouraged homicides and assaults such as the beating, stabbing of Mr. Wilson.

129.    In addition, Defendants knew that a lack of programming opportunities in the P and Q blocks left prisoners there idle. That idleness, along with inadequate supervision and monitoring, increased the likelihood of violence in those blocks.

130.    Despite this, Defendants failed to improve supervision and monitoring in the P and Q blocks.

131.    Defendants did not provide any additional staffing to the P and Q blocks or improve supervision and monitoring of existing staff in the P and Q blocks.

132.    Despite the security risk and substantial risk of serious harm created by allowing a prisoner to have unauthorized access into the cell of another prisoner—and despite the history of violence at St. Clair that occurs after a prisoner gains unauthorized access to the cell of another prisoner—correctional officers working in the "cube" make no effort to verify whether a prisoner is actually assigned to the cell that the officer is opening for the prisoner.

133.    Either (1) there are no procedures in place to confirm that a prisoner is assigned to a cell before the cube officer is allowed to open a cell door at the request of a prisoner, or (2) if such procedures do exist, they are routinely disregarded by prison staff, and neither prison leadership nor ADOC leadership seeks to enforce such procedures through training, corrective action, termination, or other methods.

134.     Despite the security risk and substantial risk of serious harm created by allowing prisoners to move freely from block to block (including the hot bay blocks), and despite the history of violence at St. Clair perpetrated by prisoners residing in one block against prisoners located in another block, correctional officers do not restrict prisoners from moving freely within their own blocks or between blocks.

135.     Either (1) there are no policies or practices at St. Clair preventing prisoners not in segregation from moving freely within their own block or from block to block or (2) if such policies or practices do exist, they are routinely disregarded by prison staff, and neither prison leadership nor ADOC leadership seeks to enforce such policies and practices through training, discipline, termination, or other methods.

136.     Defendants took no meaningful steps to address the substantial risk of serious harm to prisoners in the P and Q blocks such as Mr. Wilson, prior to his assault.

137.     These Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as Mr. Wilson at substantial risk of serious harm and caused his injuries.

    *iii.*     *Failure to Restrict Prisoner Access to Weapons*

138.     As set forth above, both the widespread availability of weapons at St. Clair and the prevalence of stabbing attacks at St. Clair were brought to the attention of Defendants through incident reports, the Cheatham lawsuit, EJI's September 6, 2018 letter, and individual prisoner lawsuits.

139.     Yet Defendants, through their acts and omissions, permitted contraband weapons to proliferate at St. Clair and failed to effectively control the introduction, manufacture, and use of contraband weapons by prisoners at St. Clair, exhibiting deliberate indifference to the substantial risk of serious harm that such weapons created to prisoners such as Mr. Wilson.

140.   The widespread proliferation of contraband weapons within St. Clair contributed to the high rate of violence, sexual abuse, and death and created a substantial risk of serious harm to prisoners such as Mr. Wilson.

141.   By the time of Mr. Wilson's assault at St. Clair, it was a matter of common knowledge among St. Clair staff that the prisoner population at St. Clair was heavily armed.

142.   Prisoners believed they needed to arm themselves at St. Clair for protection because of the endemic violence at the facility.

143.   Stab wounds were seen on a weekly, if not daily, basis.

144.   Large machete-type knives have been reported at St. Clair.

145.   At least one knife found at St. Clair was over 2 feet long.

146.   In the words of St. Clair Correctional Officer Jonathan Truitt, a single 24-person cell block at St. Clair could contain "30 to 40" contraband knives; contraband was "out of control"; and prisoners were being "being assaulted in every way imaginable."[4]

147.   Staff at St. Clair frequently responded with deliberate indifference when prisoners were observed with contraband weapons and failed to discipline prisoners found with contraband weapons.

148.   The failure to discipline prisoners in possession of contraband weapons created a dangerous culture whereby prisoners knew they could possess such weapons with impunity and felt emboldened to use such weapons without fear of incurring any disciplinary action.

149.   As set forth above, knives, box cutters, and other contraband weapons were commonly used in assaults at St. Clair.

---

[4] Brian Lyman, *Alabama Corrections Officers' Ranks Drop 20 Percent,* MONTGOMERY ADVERTISER, Jan. 7, 2017, https://www.montgomeryadvertiser.com/story/news/politics/southunionstreet/2017/01/08/alabama-corrections-officers-ranks-drop-20-percent/95762920/

150.     Despite this, Defendants permitted contraband weapons to proliferate at St. Clair and took no meaningful action to curtail the widespread availability of contraband weapons at St. Clair, exhibiting deliberate indifference to prisoners such as Mr. Wilson who were likely to be victimized by such weapons.

151.     Defendants failed to make meaningful changes to increase and improve contraband searches at St. Clair.

152.     Defendants failed to make meaningful changes to improve discipline for prisoners found with contraband weapons at St. Clair.

153.     These Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as Mr. Wilson at a substantial risk of serious harm.

154.     Predictably, Mr. Wilson was then victimized by one of the many prisoners at St. Clair that have been permitted to access a contraband weapon.

    *iv.*    *Defendants' Failure to Adequately Respond to and Discipline Instances of Prisoner Misconduct*

155.     Defendants, through their acts and omissions, failed to properly respond to and discipline prior instances of prisoner misconduct in the time period leading up to Mr. Wilson's assault at St. Clair.

156.     ADOC staff failed to properly investigate and discipline acts of violence by prisoners at St. Clair, emboldening violent prisoners such as Mr. Wilson's assailant.

157.     ADOC staff routinely discouraged victims from reporting incidents of violence or threats of violence at St. Clair.

158.     ADOC staff routinely retaliated against prisoners who reported violence and threats of violence by subjecting such prisoners to discipline in conjunction with the prisoners' reports of

violence and threats of violence. This retaliation had the effect of deterring prisoners from reporting violence and threats of violence.

159.    In many cases, prisoners were subjected to discipline for refusing to name the individuals who they feared might harm them.

160.    St. Clair did not have an established grievance system, limiting prisoners' ability to report threats of violence or sexual abuse was thus substantially limited.

161.    ADOC staff responded with deliberate indifference when prisoners were extorted by other prisoners at St. Clair, resulting in serious physical injuries and sexual abuse.

162.    These failures created a dangerous culture of violence at St. Clair, which, in turn, posed a substantial risk of serious harm to prisoners such as Mr. Wilson.

163.    Defendants were on notice of these failures, as well as the substantial risk of serious harm that resulted for prisoners such as Mr. Wilson.

164.    Defendants were put on notice of the culture of violence at St. Clair through their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, lawsuits, and media coverage.

165.    Defendants were also put on notice of the culture of violence at St. Clair through EJI's *Cheatham* litigation, which described in detail the ways in which Defendants fostered and encouraged a culture of abuse and violence at St. Clair and the resulting risks to prisoners such as Mr. Wilson.

166.    Defendants fostered the culture of violence at St. Clair through their acts and omissions.

167.    For example, Defendants failed to act to provide an established grievance system at St. Clair.

168.     Defendants, through their acts and omissions, discouraged victims from reporting incidents of violence or threats of violence at St. Clair.

169.     Defendants failed to ensure proper investigation and discipline of violence by prisoners, emboldening violent prisoners such as Mr. Wilson's attacker.

170.     Defendants, through their acts and omissions, also failed to prevent prisoners from extorting other prisoners, resulting in serious physical injuries and sexual abuse and presenting a substantial risk of serious harm to prisoners at St. Clair.

171.     Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as Mr. Wilson at substantial risk of serious harm and caused his injuries.

        *v.*     *Defendants' Failure to Respond to and Discipline Excessive Force at St. Clair*

172.     Defendants also fueled a culture of abuse at St. Clair by tolerating and condoning excessive uses of force by staff members. This culture of abuse sowed mistrust between prisoners and correctional officers and had a chilling effect on prisoners' ability and willingness to seek assistance from correctional officers in response to violence and threats of violence.

173.     Defendants' acts and omissions created a culture of abuse at St. Clair in which staff excessive force against prisoners occurred with impunity.

174.     For example:

        a.     In March 2017, officers assaulted a prisoner with severe mental health issues after he told them he thought his skin was falling off. The officers sprayed the prisoner with mace, beat him with handcuffs, and left him in his cell for three days rather than taking him to the infirmary. He was subsequently rushed to the hospital because his esophagus closed up.

        b.     In June 2017, a prisoner was sprayed with a large volume of mace in his cell at the direction of an officer after other officers discovered a broken window in his

cell. He was left alone in the cell with mace for approximately one hour despite having asthma.

      c.     In August 2017, officers assaulted an eighty-four year old prisoner who was confined to a wheelchair. He had to be taken to an outside hospital due to the severity of his injuries.

      d.     In November 2017, an officer slapped a prisoner without provocation in front of a large group of officers and incarcerated men before a meeting of the segregation board. The officer had previously been encouraged by other officers to "slap [prisoners] upside the head" whenever they "talk crazy."

      e.     In November 2017, a handcuffed prisoner was beaten by officers in the segregation yard.

      f.     In December 2017, officers assaulted a handcuffed prisoner in the D block, who had requested to be taken to a suicide cell. The officers punched him in the face, head, and body for multiple minutes.

      g.     In January 2018, officers assaulted a prisoner after he reported fearing for his life and requesting to be placed in segregation. The officers dragged the prisoner by his feet from the shift office, struck him in the head, and sprayed him with mace.

      h.     In March 2018, officers handcuffed a prisoner in the infirmary, sprayed him with a large volume of Sabre Red chemical agent so that he could not see clearly, and then proceeded to punch and kick his entire body for over ten minutes, using particular violence against his head, face, and testicles. The prisoner has experienced ongoing injuries, including difficulty with his vision.

i.      Also in March 2018, a prisoner was assaulted by an officer at a meeting of the segregation board. The prisoner reportedly made a statement about a staff member during his segregation board hearing, and the officer interjected that he was lying and slammed him forcefully into the doorframe while other officers watched. The prisoner's nose was broken in the incident, and he was then disciplined for failure to obey a direct order for leaving the place prisoners are forced to stand during their segregation board hearings.

j.      In May 2018, a prisoner was assaulted by officers after he cut his wrists in segregation, where he had been placed after suffering a sexual assault several days earlier. He was struck in the face while handcuffed by and then had his head slammed into a brick wall.

k.      Also in May 2018, an officer assaulted a prisoner in the B block, breaking his jaw.

l.      In August 2018, officers assaulted a prisoner in the B block after he asked to be moved from the top tier to the lower tier.

m.      In September 2018, a prisoner made a comment that an officer interpreted as disrespectful, so the officer tried to have his cell assignment changed so he would be next to a prisoner who had previously stabbed him. When the prisoner refused to go, an officer sprayed him with Sabre Red chemical agent and wrote a false report that the prisoner had threatened to kill an officer and charged at him.

n.      In October 2018, officers attacked a prisoner who had been beating on his cell door trying to get help after smoking a cigarette that had been laced with methamphetamine without his knowledge. The officers sprayed him with mace, picked him

up by the handcuffs and ankle cuffs, scraped him on the concrete, and beat on him while he was on the ground. He was taken to an outside hospital for treatment.

o.      In December 2018, an officer sprayed a prisoner in the face with mace and then forced the prisoner to go outside with his hands and feet shackled, while it was sleeting and the prisoner was wearing only boxer shorts.

p.      In early January 2019, an officer sprayed a prisoner in the B block, left him for more than 30 minutes without decontaminating him, then told him to cuff up forcing him to remove the splint he wore for carpal tunnel syndrome. As the prisoner walked out of the cell in cuffs, another officer jumped him from behind, busting his head open and injuring his arm. Officers took photos of the prisoner after the assault. The prisoner was then written up for disorderly conduct and disobeying a direct order.

175.    Defendants were on notice of the culture of abuse, as well as the incidents identified above, through internal sources including use-of-force reports, incident reports, duty officer reports, and medical reports, and external sources such as the *Cheatam* Complaint.

176.    The failure to discipline officers for excessive force and other misconduct signaled to the correctional officers at St. Clair that they could abuse, or fail to protect, prisoners without fear of any adverse consequences.

177.    The failure to discipline officers for excessive force and other misconduct signaled to prisoners at St. Clair that they could abuse other prisoners without fear of any adverse consequences.

178.    Defendants were on notice of the culture of abuse at St. Clair through their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, prisoner lawsuits, and media coverage.

179.     Defendants were also on notice of this culture of abuse through EJI's *Cheatham* Complaint, which described in detail the ways in which Defendants fostered and encouraged a culture of abuse at St. Clair and the resulting risks to prisoners.

180.     Defendants' conduct created a dangerous culture of violence at St. Clair, which, in turn, heightened the risk of prisoner assaults on vulnerable prisoners such as Mr. Wilson. Instead of protecting prisoners, such as Mr. Wilson, from harm, Defendants created and fostered a culture of abuse at St. Clair that exacerbated violence in all its forms.

181.     Defendants acted with deliberate indifference and their misconduct placed vulnerable prisoners such as Mr. Wilson at substantial risk of serious harm and caused his injuries.

## CAUSES OF ACTION

### COUNT I —EIGHTH AMENDMENT FAILURE TO PROTECT

### [42 U.S.C § 1983]

### (Against Defendants Dunn, Daniels, Warden Jones, Givens, and Brooks)

182.     Mr. Wilson incorporates each paragraph of this Complaint as if fully restated here.

183.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Wilson is entitled to be free from a substantial risk of serious harm while in the custody of the State.

184.     Protection from violence is one of the necessities of life that the State must provide prisoners under the Eighth Amendment.

185.     A constitutional duty of care arises when an individual's liberty has been restrained through the state's affirmative exercise of power over him, rendering unable to care for himself.

186.     Defendants Dunn, Daniels, Warden Jones, Givens, and Brooks, acting individually and in concert with each other, failed to protect Mr. Wilson.

187.     Defendants Dunn, Daniels, Warden Jones, Givens, and Brooks knew of and consciously disregarded the substantial risk that Mr. Wilson would be seriously harmed while in custody, failing to protect him from harm.

188.     The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, or reckless indifference to the rights of Mr. Wilson and others and was objectively unreasonable.

189.     Defendants Dunn, Daniels, Warden Jones, Givens, and Brooks's misconduct directly and proximately caused Mr. Wilson to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

190.     Defendant Dunn failed to protect Mr. Wilson in the following ways:

a.     Defendant Dunn knew of widespread violence at St. Clair for years preceding Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Dunn nevertheless failed to protect Mr. Wilson from the violence Mr. Lawyer perpetrated against Mr. Wilson, which caused Mr. Wilson's injuries.

b.     Defendant Dunn knew of the prevalence of contraband at St. Clair for years preceding Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Dunn nevertheless failed to protect Mr. Wilson from Mr. Lawyer accessing contraband at St. Clair, which he used to stab and injure Mr. Wilson.

c.     Defendant Dunn knew that the P and Q blocks were hot bays heavily concentrated with violent prisoners with disciplinary problems, for years preceding Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Dunn nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused

by inadequate or inadequately enforced policies designed to ensure safe housing assignments.

d.      Defendant Dunn knew of the prevalence of prisoners moving freely between cellblocks at St. Clair for years preceding Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Dunn nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by permitting Mr. Lawyer to move from his assigned cell in the P block into the Q block so as to gain access to Mr. Wilson's cell to carry out the attack.

e.      Defendant Dunn knew that keeping prisoners' cell doors locked at St. Clair was chronically problematic and created a dangerous environment in which prisoners could obtain unauthorized access through unlocked doors into cells to which they were not assigned. In spite of the notice and his knowledge, Defendant Dunn nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by caused by inadequate or inadequately enforced policies designed to ensure that prisoners' cells remained locked.

f.      Defendant Dunn knew that Defendant Daniels issued the "controlled movement directive," which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair. In spite of the notice and his knowledge, Defendant Dunn nevertheless failed to implement or enforce the directive at St. Clair and thereby failed to protect Mr. Wilson from Mr. Lawyer moving from his assigned cell into the Q block, entering Mr. Wilson's cell, and stabbing and injuring Mr. Wilson.

g.      Defendant Dunn knew of the correctional understaffing at St. Clair and that it created a substantial risk of serious harm to prisoners for years preceding Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Dunn nevertheless failed to implement policies and practices to ensure that staffing was adequate to prevent Mr. Lawyer's unauthorized entry into Mr. Wilson's cell and the resulting attack.

191.    Defendant Daniels failed to protect Mr. Wilson in the following ways:

a.      Defendant Daniels knew of widespread violence at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Daniels nevertheless failed to protect Mr. Wilson from the violence Mr. Lawyer perpetrated against Mr. Wilson, which caused Mr. Wilson's injuries.

b.      Defendant Daniels knew of the prevalence of contraband at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Daniels nevertheless failed to protect Mr. Wilson from Mr. Lawyer accessing contraband at St. Clair, which he used to stab and injure Mr. Wilson.

c.      Defendant Daniels knew that the P and Q blocks were hot bays heavily concentrated with violent prisoners with disciplinary problems well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Daniels nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by inadequate or inadequately enforced policies designed to ensure safe housing assignments.

d.      Defendant Daniels knew of the prevalence of prisoners moving freely between cellblocks at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Daniels nevertheless failed to protect Mr.

Wilson from the substantial risk of serious harm caused by permitting Mr. Lawyer to move from his assigned cell in the P block into the Q block so as to gain access to Mr. Wilson's cell to carry out the attack.

e.     Defendant Daniels knew that keeping prisoners' cell doors locked at St. Clair was chronically problematic and created a dangerous environment in which prisoners could obtain unauthorized access through unlocked doors into cells to which they were not assigned. In spite of the notice and his knowledge, Defendant Daniels nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by caused by inadequate or inadequately enforced policies designed to ensure that prisoners' cells remained locked.

f.     Defendant Daniels issued the "controlled movement directive," which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair. In spite of the notice and his knowledge, Defendant Daniels nevertheless failed to implement or enforce the directive at St. Clair and thereby failed to protect Mr. Wilson from Mr. Lawyer moving from his assigned cell into the Q block, entering Mr. Wilson's cell, and stabbing and injuring Mr. Wilson.

g.     Defendant Daniels knew of the correctional understaffing at St. Clair and that it created a substantial risk of serious harm to prisoners well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Daniels nevertheless failed to implement policies and practices to ensure that staffing was adequate to prevent Mr. Lawyer's unauthorized entry into Mr. Wilson's cell and the resulting attack.

192.     Defendant Warden Jones failed to protect Mr. Wilson in the following ways:

a.      Defendant Warden Jones knew of widespread violence at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Warden Jones nevertheless failed to protect Mr. Wilson from the violence Mr. Lawyer perpetrated against Mr. Wilson, which caused Mr. Wilson's injuries.

b.      Defendant Warden Jones knew of the prevalence of contraband at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Warden Jones nevertheless failed to protect Mr. Wilson from Mr. Lawyer accessing contraband at St. Clair, which he used to stab and injure Mr. Wilson.

c.      Defendant Warden Jones knew that the P and Q blocks were hot bays heavily concentrated with violent prisoners with disciplinary problems well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Warden Jones nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by inadequate or inadequately enforced policies designed to ensure safe housing assignments.

d.      Defendant Warden Jones knew of the prevalence of prisoners moving freely between cellblocks at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Warden Jones nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by permitting Mr. Lawyer to move from his assigned cell in the P block into the Q block so as to gain access to Mr. Wilson's cell to carry out the attack.

e.      Defendant Warden Jones knew that keeping prisoners' cell doors locked at St. Clair was chronically problematic and created a dangerous environment in which

prisoners could obtain unauthorized access through unlocked doors into cells to which they were not assigned. In spite of the notice and her knowledge, Defendant Warden Jones nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by caused by inadequate or inadequately enforced policies designed to ensure that prisoners' cells remained locked.

f.      Defendant Warden Jones knew that correctional officers at St. Clair routinely leave previously locked cell doors open or unlocked after a prisoner count—a practice which had been occurring well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Warden Jones nevertheless failed to protect Mr. Wilson from Mr. Lawyer gaining access into Mr. Wilson's cell and stabbing and injuring Mr. Wilson.

g.      Defendant Warden Jones received the "controlled movement directive," which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair. In spite of the notice and her knowledge, Defendant Warden Jones nevertheless failed to implement or enforce the directive at St. Clair and thereby failed to protect Mr. Wilson from Mr. Lawyer moving from his assigned cell into the Q block, entering Mr. Wilson's cell, and stabbing and injuring Mr. Wilson.

h.      Defendant Warden Jones knew of the correctional understaffing at St. Clair and that it created a substantial risk of serious harm to prisoners well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Warden Jones nevertheless failed to implement policies and practices to ensure that staffing

was adequate to prevent Mr. Lawyer's unauthorized entry into Mr. Wilson's cell and the resulting attack.

i.      Defendant Warden Jones failed to prevent Mr. Lawyer from accessing the Q block when Mr. Lawyer was not assigned to the Q block.

j.      Defendant Warden Jones failed to prevent Mr. Lawyer from gaining possession of a knife or other weapon.

k.      Defendant Warden Jones failed to prevent Mr. Lawyer from gaining access to Mr. Wilson's cell without authorization.

l.      Defendant Warden Jones failed to prevent Mr. Lawyer from attacking and stabbing Mr. Wilson repeatedly while he slept in his cell.

193.   Defendant Givens failed to protect Mr. Wilson in the following ways:

a.      Defendant Givens knew of widespread violence at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Givens nevertheless failed to protect Mr. Wilson from the violence Mr. Lawyer perpetrated against Mr. Wilson, which caused Mr. Wilson's injuries.

b.      Defendant Givens knew of the prevalence of contraband at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Givens nevertheless failed to protect Mr. Wilson from Mr. Lawyer accessing contraband at St. Clair, which he used to stab and injure Mr. Wilson.

c.      Defendant Givens knew that the P and Q blocks were hot bays heavily concentrated with violent prisoners with disciplinary problems well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Givens nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused

by inadequate or inadequately enforced policies designed to ensure safe housing assignments.

      d.    Defendant Givens knew of the prevalence of prisoners moving freely between cellblocks at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Givens nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by permitting Mr. Lawyer to move from his assigned cell in the P block into the Q block so as to gain access to Mr. Wilson's cell to carry out the attack.

      e.    Defendant Givens knew that keeping prisoners' cell doors locked at St. Clair was chronically problematic and created a dangerous environment in which prisoners could obtain unauthorized access through unlocked doors into cells to which they were not assigned. In spite of the notice and her knowledge, Defendant Givens nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by caused by inadequate or inadequately enforced policies designed to ensure that prisoners' cells remained locked.

      f.    Defendant Givens knew that correctional officers at St. Clair routinely leave previously locked cell doors open or unlocked after a prisoner count—a practice which had been occurring well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Givens nevertheless failed to protect Mr. Wilson from Mr. Lawyer gaining access into Mr. Wilson's cell and stabbing and injuring Mr. Wilson.

      g.    Defendant Givens received the "controlled movement directive," which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair. In spite of the notice and her knowledge,

Defendant Givens nevertheless failed to implement or enforce the directive at St. Clair and thereby failed to protect Mr. Wilson from Mr. Lawyer moving from his assigned cell into the Q block, entering Mr. Wilson's cell, and stabbing and injuring Mr. Wilson.

h.     Defendant Givens knew of the correctional understaffing at St. Clair and that it created a substantial risk of serious harm to prisoners well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and her knowledge, Defendant Givens nevertheless failed to implement policies and practices to ensure that staffing was adequate to prevent Mr. Lawyer's unauthorized entry into Mr. Wilson's cell and the resulting attack.

i.     Defendant Givens failed to prevent prisoner Mr. Lawyer from accessing the Q block when Mr. Lawyer was not assigned to the Q block.

j.     Defendant Givens failed to prevent prisoner Mr. Lawyer from gaining possession of a knife or other weapon.

k.     Defendant Givens failed to prevent prisoner Mr. Lawyer from gaining access to Mr. Wilson's cell without authorization.

l.     Defendant Givens failed to prevent prisoner Mr. Lawyer from attacking and stabbing Mr. Wilson repeatedly while he slept in his cell.

194.   Defendant Brooks failed to protect Mr. Wilson in the following ways:

a.     Defendant Brooks knew of widespread violence at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Brooks nevertheless failed to protect Mr. Wilson from the violence Mr. Lawyer perpetrated against Mr. Wilson, which caused Mr. Wilson's injuries.

b.     Defendant Brooks knew of the prevalence of contraband at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge,

Defendant Brooks nevertheless failed to protect Mr. Wilson from Mr. Lawyer accessing contraband at St. Clair, which he used to stab and injure Mr. Wilson.

c.     Defendant Brooks knew that the P and Q blocks were hot bays heavily concentrated with violent prisoners with disciplinary problems well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Brooks nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by inadequate or inadequately enforced policies designed to ensure safe housing assignments.

d.     Defendant Brooks knew of the prevalence of prisoners moving freely between cellblocks at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Brooks nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by permitting Mr. Lawyer to move from his assigned cell in the P block into the Q block so as to gain access to Mr. Wilson's cell to carry out the attack.

e.     Defendant Brooks knew that keeping prisoners' cell doors locked at St. Clair was chronically problematic and created a dangerous environment in which prisoners could obtain unauthorized access through unlocked doors into cells to which they were not assigned. In spite of the notice and his knowledge, Defendant Brooks nevertheless failed to protect Mr. Wilson from the substantial risk of serious harm caused by caused by inadequate or inadequately enforced policies designed to ensure that prisoners' cells remained locked.

f.     Defendant Brooks knew that correctional officers at St. Clair routinely leave previously locked cell doors open or unlocked after a prisoner count—a practice which had

been occurring well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Brooks nevertheless failed to protect Mr. Wilson from Mr. Lawyer gaining access into Mr. Wilson's cell and stabbing and injuring Mr. Wilson.

g.      Defendant Brooks received the "controlled movement directive," which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair. In spite of the notice and his knowledge, Defendant Brooks nevertheless failed to implement or enforce the directive at St. Clair and thereby failed to protect Mr. Wilson from Mr. Lawyer moving from his assigned cell into the Q block, entering Mr. Wilson's cell, and stabbing and injuring Mr. Wilson.

h.      Defendant Brooks knew of the correctional understaffing at St. Clair and that it created a substantial risk of serious harm to prisoners well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and his knowledge, Defendant Brooks nevertheless failed to implement policies and practices to ensure that staffing was adequate to prevent Mr. Lawyer's unauthorized entry into Mr. Wilson's cell and the resulting attack.

i.      Defendant Brooks failed to prevent prisoner Mr. Lawyer from accessing the Q block when Mr. Lawyer was not assigned to the Q block.

j.      Defendant Brooks failed to prevent prisoner Mr. Lawyer from gaining possession of a knife or other weapon.

k.      Defendant Brooks failed to prevent prisoner Mr. Lawyer from gaining access to Mr. Wilson's cell without authorization.

l.      Defendant Brooks failed to prevent prisoner Mr. Lawyer from attacking and stabbing Mr. Wilson repeatedly while he slept in his cell.

## COUNT II —EIGHTH AMENDMENT FAILURE TO PROTECT

### [42 U.S.C § 1983]

### (Against Defendants Barlow, Officer Jones, and Officer Valdez)

195.    Mr. Wilson incorporates each paragraph of this Complaint as if fully restated here.

196.    Pursuant to the Eighth Amendment of the United States Constitution, Mr. Wilson is entitled to be free from a substantial risk of serious harm while in the custody of the State.

197.    Protection from violence is one of the necessities of life that the State must provide prisoners under the Eighth Amendment.

198.    A constitutional duty of care arises when an individual's liberty has been restrained through the state's affirmative exercise of power over him, rendering unable to care for himself.

199.    Defendants Barlow, Officer Jones, and Officer Valdez, acting individually and in concert with each other, failed to protect Mr. Wilson.

200.    Defendants Barlow, Officer Jones, and Officer Valdez knew of and consciously disregarded the substantial risk that Mr. Wilson would be seriously harmed while in custody, failing to protect him from harm.

201.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, or reckless indifference to the rights of Mr. Wilson and others, and was objectively unreasonable.

202.    Defendants Barlow, Officer Jones, and Officer Valdez's misconduct directly and proximately caused Mr. Wilson to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries.

203.    Defendants Barlow, Officer Jones, and Officer Valdez failed to protect Mr. Wilson in the following ways:

a.      Defendants Barlow, Officer Jones, and Officer Valdez knew of widespread violence at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and their knowledge, Defendants Barlow, Officer Jones, and Officer Valdez nevertheless failed to protect Mr. Wilson from the violence Mr. Lawyer perpetrated against Mr. Wilson, which caused Mr. Wilson's injuries.

b.      Defendants Barlow, Officer Jones, and Officer Valdez knew of the prevalence of contraband at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and their knowledge, Defendants Barlow, Officer Jones, and Officer Valdez nevertheless failed to inspect for, search, and seize weapons and contraband to protect Mr. Wilson from the weapon Mr. Lawyer used to stab and injure Mr. Wilson.

c.      Defendants Barlow, Officer Jones, and Officer Valdez knew that the P and Q blocks were hot bays heavily concentrated with violent prisoners with disciplinary problems well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and their knowledge, Defendants Barlow, Officer Jones, and Officer Valdez nevertheless failed to adequately monitor and supervise the prisoners in the P and Q blocks.

d.      Defendants Barlow, Officer Jones, and Officer Valdez knew of the prevalence of prisoners moving freely between cellblocks at St. Clair well in advance of Mr. Lawyer's attack on Mr. Wilson. In spite of the notice and their knowledge, Defendants Barlow, Officer Jones, and Officer Valdez nevertheless failed to protect Mr. Wilson from Mr. Lawyer moving from his assigned cell into the Q block, entering Mr. Wilson's cell, and stabbing and injuring Mr. Wilson.

e.      Defendants Barlow, Officer Jones, and Officer Valdez knew that the "controlled movement directive" had been issued, which required heightened supervision

of staff and prisoners and limited out-of-cell time for prisoners in the P and Q blocks at St. Clair. In spite of the notice and their knowledge, Defendants Barlow, Officer Jones, and Officer Valdez nevertheless failed to abide by the directive at St. Clair and thereby failed to protect Mr. Wilson from Mr. Lawyer moving from his assigned cell into the Q block, entering Mr. Wilson's cell, and stabbing and injuring Mr. Wilson.

       f.      Defendants Barlow, Officer Jones, and Officer Valdez failed to prevent Mr. Lawyer from accessing the Q block when Mr. Lawyer was not assigned to the Q block.

       g.      Defendants Barlow, Officer Jones, and Officer Valdez failed to prevent Mr. Lawyer from gaining possession of a knife or other weapon.

       h.      Defendants Barlow, Officer Jones, and Officer Valdez failed to prevent Mr. Lawyer from gaining access to Mr. Wilson's cell without authorization.

       i.      Defendants Barlow, Officer Jones, and Officer Valdez failed to prevent Mr. Lawyer from attacking and stabbing Mr. Wilson repeatedly while he slept in his cell.

## COUNT III —EIGHTH AND FOURTEENTH AMENDMENT STATE-CREATED DANGER

### [42 U.S.C § 1983]

### (Against Defendants Dunn, Daniels, Warden Jones, Givens, and Brooks)

204.    Mr. Wilson incorporates each paragraph of this Complaint as if fully restated here.

205.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Mr. Wilson is entitled to be free from a known and substantial risk of serious harm while in the custody of the State, including from a State-created danger.

206.    However, in violation of Mr. Wilson's Eighth and Fourteenth Amendment rights, Defendants Dunn, Daniels, Warden Jones, Givens, and Brooks —through their acts and omissions—knowingly created an environment that posed a substantial risk that Mr. Wilson would be seriously harmed while in custody.

207.    Defendants Dunn, Daniels, Warden Jones, Givens, and Brooks, acting individually and in conspiracy with other Defendants, designed and implemented a hot bay policy that grouped individuals with behavior problems together in general population in the P and Q blocks where the prisoners lacked programming opportunities and an adequate presence of correctional officers.

208.    After establishing the hot bay policy, Defendants Dunn, Daniels, Warden Jones, Givens, and Brooks, acting individually and in conspiracy with other Defendants, failed to ensure adequate supervision of prisoners by:

      a.    Failing to implement and enforce sufficient screening and inspection protocols for contraband, such as weapons;

      b.    Failing to restrict prisoner movement within their own blocks and between blocks;

      c.    Failing to implement procedures that prevented prisoners from gaining access to other prisoners' cells, such as verifying that a prisoner was permitted to enter a particular cell before being "buzzed" in by the on-duty cube officer;

      d.    Failing to provide adequate staffing levels and training for correctional officers;

      e.    Failing to adequately punish violent conduct by prisoners in order to discourage further incidents of violence; and

      f.    Failing to ensure that correctional officers followed policies and procedures put in place to ensure prisoner safety—to the extent that such policies and procedures existed.

209.     These acts and omissions gave rise to a state-created danger in the P and Q blocks at St. Clair, which directly and proximately caused Mr. Wilson to be subjected to a substantial risk of serious harm. As a result, Mr. Wilson suffered horrific physical and emotional injuries.

210.     The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and reckless indifference to the rights of prisoners such as Mr. Wilson and was objectively unreasonable.

## COUNT IV —STATE LAW NEGLIGENCE

### (Against Defendants Dunn and Daniels)

211.     Mr. Wilson incorporates each paragraph of this Complaint as if fully restated here.

212.     Defendants Dunn and Daniels had a duty of care to Mr. Wilson.

213.     Defendants Dunn and Daniels owed a duty to Mr. Wilson to investigate and act to stop the widespread violence, which had been occurring at St. Clair for years preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Dunn and Daniels were or through exercise of reasonable diligence should have been aware.

214.     Defendants Dunn and Daniels owed a duty to Mr. Wilson to investigate and act to stop the prevalence of weapons and contraband inside of St. Clair for years preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Dunn and Daniels were or through the exercise of reasonable diligence should have been aware.

215.     Defendants Dunn and Daniels owed a duty to Mr. Wilson to investigate and act to stop prisoners from moving freely between cellblocks at St. Clair, which had been occurring for years preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Dunn and Daniels were or through the exercise of reasonable diligence should have been aware.

216.    Defendants Dunn and Daniels owed a duty to Mr. Wilson to investigate and act to stop prisoners from accessing the cells of other prisoners without authorization at St. Clair, which had been occurring for years preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Dunn and Daniels were or through the exercise of reasonable diligence should have been aware.

217.    Defendants Dunn and Daniels owed a duty to Mr. Wilson to investigate and act to ensure that prisoners' cell doors remained locked in light of the history of unlocked cell doors allowing prisoners to access others' cells and carry out violent attacks, which had been occurring for years preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Dunn and Daniels were or through the exercise of reasonable diligence should have been aware.

218.    Defendants Dunn and Daniels owed a duty to Mr. Wilson to investigate and act to stop correctional officers at St. Clair from leaving cell doors open or unlocked after a count, about which Defendants Dunn and Daniels were or through the exercise of reasonable diligence should have been aware.

219.    Defendants Dunn and Daniels owed a duty to Mr. Wilson to develop, communicate, implement, enforce, and revise as necessary policies and practices which:

    a.     prevent the P and Q blocks at St. Clair from becoming hot bays;

    b.     prevent prisoners from moving freely between cell blocks at St. Clair, including the P and Q blocks;

    c.     prevent prisoners from obtaining, fabricating, and possessing weapons including knives and other dangerous, contraband instruments;

    d.     prevent prisoners from accessing the cells of other prisoners without authorization;

e.      require correctional officers to verify that a prisoner is seeking entry only into his assigned cell before buzzing the prisoner into the cell; and

f.      require correctional officers to confirm that cell doors remained locked in accordance with applicable policies and appropriate practices.

220.    Defendants Dunn and Daniels owed a duty to Mr. Wilson to implement or enforce the "controlled movement directive" issued by Defendant Daniels, which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks;

221.    Defendants Dunn and Daniels each breached these duties of care.

222.    In doing so, Defendants Dunn and Daniels acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

223.    Defendants Dunn and Daniels's breaches of their duties of care to Mr. Wilson directly and proximately caused Mr. Wilson to suffer damages, including physical and emotional pain and suffering.

### COUNT V —STATE LAW NEGLIGENCE

### (Against Defendants Warden Jones, Givens and Brooks)

224.    Mr. Wilson incorporates each paragraph of this Complaint as if fully restated here.

225.    Defendants Warden Jones, Givens and Brooks had a duty of care to Mr. Wilson.

226.    Defendants Warden Jones, Givens and Brooks owed a duty to Mr. Wilson to investigate and act to stop the widespread violence, which had been occurring at St. Clair for years preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Warden Jones, Givens and Brooks were or through exercise of reasonable diligence should have been aware.

227.    Defendants Warden Jones, Givens and Brooks owed a duty to Mr. Wilson to investigate and act to stop the prevalence of weapons and contraband inside of St. Clair for years

preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Warden Jones, Givens and Brooks were directly aware or through the exercise of reasonable diligence should have been aware.

228.    Defendants Warden Jones, Givens, and Brooks owed a duty to Mr. Wilson to investigate and act to stop prisoners from moving freely between cell blocks at St. Clair, which had been occurring for years preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Warden Jones, Givens and Brooks were directly aware or through the exercise of reasonable diligence should have been aware.

229.    Defendants Warden Jones, Givens, and Brooks owed a duty to Mr. Wilson to investigate and act to stop prisoners from accessing the cells of other prisoners without authorization at St. Clair, which had been occurring for years preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Warden Jones, Givens, and Brooks were directly aware or through the exercise of reasonable diligence should have been aware.

230.    Defendants Warden Jones, Givens, and Brooks owed a duty to Mr. Wilson to investigate and act to stop correctional officers at St. Clair from buzzing prisoners into a cell without verifying that the prisoner is assigned to the cell, which had been occurring for years preceding Mr. Lawyer's attack on Mr. Wilson, and about which Defendants Warden Jones, Givens and Brooks were directly aware or through the exercise of reasonable diligence should have been aware.

231.    Defendants Warden Jones, Givens, and Brooks owed a duty to Mr. Wilson to investigate and act to stop correctional officers at St. Clair from leaving cell doors open or unlocked after a count, about which Defendants Warden Jones, Givens, and Brooks were directly aware or through the exercise of reasonable diligence should have been aware.

232.     Defendants Warden Jones, Givens and Brooks owed a duty to Mr. Wilson to develop, communicate, implement, enforce, and revise as necessary policies and practices which:

        a.     prevent the P and Q blocks at St. Clair from becoming hot bays;

        b.     prevent prisoners from moving freely between cell blocks at St. Clair, including the P and Q blocks;

        c.     prevent prisoners from obtaining, fabricating, and possessing weapons including knives and other dangerous, contraband instruments;

        d.     prevent prisoners from accessing the cells of other prisoners without authorization;

        e     require correctional officers to verify that a prisoner is seeking entry only into his assigned cell before buzzing the prisoner into the cell; and

        f.     require correctional officers to confirm that cell doors remained locked in accordance with applicable policies and appropriate practices.

233.     Defendants Warden Jones, Givens, and Brooks owed a duty to Mr. Wilson to implement or enforce the "controlled movement directive" issued by Defendant Daniels, which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks.

234.     Defendants Warden Jones, Givens, and Brooks owed a duty to Mr. Wilson to prevent Mr. Lawyer from accessing the Q block when Mr. Lawyer was not assigned to the Q block;

235.     Defendants Warden Jones, Givens, and Brooks owed a duty to Mr. Wilson to prevent Mr. Lawyer from gaining possession of a knife or other weapon;

236.     Defendants Warden Jones, Givens, and Brooks owed a duty to Mr. Wilson to prevent Mr. Lawyer from gaining access to Mr. Wilson's cell without authorization.

237.    Defendants Warden Jones, Givens, and Brooks owed a duty to Mr. Wilson to prevent Mr. Lawyer from attacking and stabbing Mr. Wilson repeatedly while he slept in his cell.

238.    Defendants Warden Jones, Givens and Brooks each breached their duties of care.

239.    In doing so, Defendants Warden Jones, Givens and Brooks acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

240.    Defendants Warden Jones, Givens and Brooks's breaches of their duties of care to Mr. Wilson directly and proximately caused Mr. Wilson to suffer damages, including physical and emotional pain and suffering.

### COUNT VI —STATE LAW NEGLIGENCE

### (Against Defendants Barlow, Officer Jones, and Officer Valdez)

241.    Mr. Wilson incorporates each paragraph of this Complaint as if fully restated here.

242.    Defendants Barlow, Officer Jones, and Officer Valdez had a duty of care to Mr. Wilson.

243.    Defendant Barlow owed a duty to Mr. Wilson to:

a.    ensure that Mr. Wilson's cell door was re-locked after the prisoner count was conducted;

b.    ensure that Mr. Wilson's cell door was opened only by or for authorized personnel while Mr. Wilson slept;

c.    ensure that prisoners from other blocks were not allowed access into Mr. Wilson's cell in the Q block while he slept;

d.    ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block with a knife or other contraband weapon while Mr. Wilson slept; and

e.      ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block and attack him while he slept.

244.    Defendant Officers Jones and Valdez owed a duty to Mr. Wilson to:

a.      ensure that Mr. Wilson's cell door was re-locked after conducting the prisoner count;

b.      ensure that prisoners from other blocks were not allowed access into Mr. Wilson's cell in the Q block while he slept;

c.      ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block with a knife or other contraband weapon while Mr. Wilson slept; and

d.      ensure that prisoners from other blocks did not enter Mr. Wilson's cell in the Q block and attack him while he slept.

245.    Defendants Barlow, Officer Jones and Officer Valdez owed a duty to Mr. Wilson to carry out policies and practices which:

a.      prevent prisoners from moving freely between cell blocks at St. Clair, including the P and Q blocks;

b.      prevent prisoners from obtaining, fabricating, and possessing weapons including knives and other dangerous, contraband instruments;

c.      prevent prisoners from accessing the cells of other prisoners without authorization;

d       require correctional officers to verify that a prisoner is seeking entry only into his assigned cell before buzzing the prisoner into the cell; and

e.      Require correctional officers to confirm that cell doors remained locked in accordance with applicable policies and appropriate practices.

246.     Defendants Barlow, Officer Jones and Officer Valdez owed a duty to Mr. Wilson to carry out the "controlled movement directive" issued by Defendant Daniels, which (1) required heightened supervision of staff and prisoners and (2) limited out-of-cell time for prisoners in the P and Q blocks at St. Clair.

247.     Defendants Barlow, Officer Jones, and Officer Valdez owed a duty to Mr. Wilson to prevent Mr. Lawyer from accessing the Q block when Mr. Lawyer was not assigned to the Q block;

248.     Defendants Barlow, Officer Jones, and Officer Valdez owed a duty to Mr. Wilson to prevent Mr. Lawyer from gaining possession of a knife or other weapon;

249.     Defendants Barlow, Officer Jones, and Officer Valdez owed a duty to Mr. Wilson to prevent Mr. Lawyer from gaining access to Mr. Wilson's cell without authorization.

250.     Defendants Barlow, Officer Jones, and Officer Valdez owed a duty to Mr. Wilson to prevent Mr. Lawyer from attacking and stabbing Mr. Wilson repeatedly while he slept in his cell.

251.     Defendants Barlow, Officer Jones, and Officer Valdez each breached their duties of care.

252.     In doing so, Defendants Barlow, Officer Jones, and Officer Valdez acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

253.     Defendants Barlow, Officer Jones, and Officer Valdez's breaches of their duties of care to Mr. Wilson directly and proximately caused Mr. Wilson to suffer damages, including physical and emotional pain and suffering

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Jamal Rashad Wilson respectfully requests that this Honorable Court enter a judgment in his favor and against all Defendants, awarding compensatory damages, punitive damages, attorneys' fees, costs, and any interest accrued against each Defendant, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Jamal Rashad Wilson hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

*/s/ Anil A. Mujumdar* (ASB-2004-L65M)

<table>
<tr><td><u>OF COUNSEL</u>:</td><td>FOLEY & LARDNER LLP</td></tr>
<tr><td><br><b>DAGNEY JOHNSON LAW GROUP</b><br>2170 Highland Avenue S, Suite 250<br>Birmingham, Alabama 35205<br>T: 205.590.6986<br>F: 205.809.7899<br>E: anil@dagneylaw.com</td><td><b>David G. Cabrales</b><br>Texas Bar No. 00787179<br><i>Pro hac vice application forthcoming</i><br>dcabrales@foley.com<br><b>Davis G. Mosmeyer III</b><br>Texas Bar No. 24106346<br><i>Pro hac vice application forthcoming</i><br>dmosmeyer@foley.com<br><b>Amanda L. Soler</b><br>Texas Bar No. 24109593<br><i>Pro hac vice application forthcoming</i><br>asoler@foley.com<br>2021 McKinney Avenue, Suite 1600<br>Dallas, TX 75201-3340<br><br><b>Counsel for Plaintiff<br>Jamal Rashad Wilson</b></td></tr>
</table>