FILED
2022 Jul-28  AM 11:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **JAMAL WILSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **4:21-cv-00352-KOB** |
| **JEFFERSON DUNN,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Nelson Mandela said, "no one truly knows a nation until one has been inside its jails."[1] Plaintiff Jamal Wilson has spent nearly five years in Alabama's St. Clair Correctional Facility. The injuries he suffered and the conditions he alleges at St. Clair paint a troubling picture of that facility and—if Mr. Mandela is to be believed—of this nation, or at least the State of Alabama.

Mr. Wilson resides in the "Q" cell block at St. Clair, which he alleges Defendants have designated as a "hot bay" to concentrate the most violent residents in the maximum-security facility. On March 6, 2019, an inmate from another cell block entered Mr. Wilson's cell while he slept and stabbed him repeatedly in his face and body. Mr. Wilson survived the attack and now brings

---

[1] United Nations, *Nelson Mandela International Day 18 July*, https://www.un.org/en/events/mandeladay/mandela_rules.shtml (last visited July 18, 2022).

this suit.

Mr. Wilson alleges severe security failures in Q block, including widespread contraband weapons, understaffing, poor inmate supervision, and unrestricted prisoner movement among cell blocks. These failings allegedly result in hundreds of violent incidents at St. Clair per year, including the attack on Mr. Wilson.

In this suit, Mr. Wilson asserts claims against three sets of defendants: the Alabama Department of Corrections Commissioner Jefferson Dunn and ADOC Associate Commissioner Charles Daniels, that is, the "ADOC Officials"; the "St. Clair Officials," including Warden Karla Jones, Assistant Warden Gwendolyn Givens, and Assistant Warden Anthony Brooks; and the "St. Clair Guards," including Officer Brandon Barlow, Officer Jones, and Officer Valdez. He sues each of the Defendants only in their individual capacity.

Under 42 U.S.C. § 1983, Mr. Wilson asserts an Eighth Amendment failure-to-protect claim against all Defendants, based on the injuries he sustained in the attack on March 6, 2019 (Count I against the ADOC Officials and St. Clair Officials and Count II against the St. Clair Guards). (Doc. 1 at 50). He also claims that the ADOC Officials and St. Clair Officials violated the Eighth and Fourteenth Amendments by subjecting him to a state-created danger (Count III). (*Id.* at 62). And he alleges state law negligence claims against all Defendants (Counts IV–VI). (*Id.* at 64).

The St. Clair Officials and the St. Clair Guards moved to dismiss Mr. Wilson's claims (doc. 45), and the ADOC Officials did so as well (doc. 47). All the Defendants challenge the sufficiency of Mr. Wilson's claims, and they argue that several immunity doctrines apply, including Eleventh Amendment immunity, qualified immunity, State-agent immunity, and State constitutional immunity. Mr. Wilson filed a consolidated response (doc. 51), and the Defendants replied (docs. 52, 53).

For the reasons explained below, the court will deny Defendants' motions to dismiss. The court finds that Mr. Wilson plausibly alleges Eighth Amendment violations and state law negligence by the Defendants, and the court finds that no immunity doctrines shield the Defendants.

## I.   FACTS

Mr. Wilson's complaint encompasses seventy-two pages; the court will do its best to summarize the factual allegations here. And Mr. Wilson attached to his complaint several court filings and a Department of Justice investigation concerning security failures at St. Clair. *E.g.*, (doc. 1-1). The DOJ initiated its investigation in October 2016, and its findings ultimately led to the DOJ's filing a prison conditions suit against the State of Alabama in 2020. *See United States v. Alabama, et al.*, No. 2:20-cv-1971-RDP (N.D. Ala.). Because Wilson attached those documents to his complaint and thus incorporated their contents by

reference, the court may consider them as part of the record at the motion to dismiss stage. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("Where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claims, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal.").

For the purposes of this decision, the court accepts as true the well-pled facts of the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). These facts, however, may not be the facts as discovery proceeds and as they are tested.

### A.   <u>The Attack on Mr. Wilson</u>

On the afternoon of March 6, 2019, Mr. Wilson took a nap in his cell in Q block. (Doc. 1 at 17). Before his nap, Mr. Wilson entered his cell by notifying Defendant Brandon Barlow, who was the correctional officer stationed in the "cube." The cube officer sits in a cubicle overlooking some of the cell doors and authorizes inmates to enter individual cells by "buzzing" them in. After Defendant Barlow buzzed Mr. Wilson into his cell, Mr. Wilson ensured that the cell door locked behind him.

Around 6:00 PM that evening, Defendants Jones and Valdez, St. Clair guards, conducted a prisoner count. Mr. Wilson remained asleep during the count, but prison policy required the guards conducting headcount to enter his cell and

count who was inside. Policy also required the guards to leave the cell door as they found it—allegedly, locked.

Around 7:00 PM, Ontario Lawyer, a prisoner residing St. Clair's adjacent P block, gained unauthorized access to Mr. Wilson's cell. (Doc. 1 at 18). Mr. Wilson awoke to Mr. Lawyer attacking him, including stabbing him once in the face and nine times on his body. Mr. Wilson was asleep before the attack began, so he alleges alternative theories for how Mr. Lawyer entered his cell:

> Because Mr. Wilson locked his cell door behind him, the only possible explanations for how Mr. Lawyer was able to enter the cell are: (1) Defendants Officers Jones and Valdez failed to lock Mr. Wilson's cell after conducting prisoner count; or (2) Defendant Barlow "buzzed" Mr. Lawyer into the cell.

(Doc. 1 at 18).

Lawyer injured Mr. Wilson's skull, nose, and sinuses. After the attack, Lawyer left Mr. Wilson alone in his cell. Mr. Wilson crawled out of his cell, and fellow prisoners tended his wounds and helped him gain the attention of guards on duty. Mr. Wilson later received treatment in the prison's infirmary and, ultimately, at a nearby hospital.

**B.    Conditions at St. Clair**

St. Clair is a maximum-security prison housing roughly 900 inmates. (Doc. 1 at 17; doc. 1-1 at 8). Mr. Wilson alleges that Defendants permitted dangerous conditions to persist at St. Clair by, among other things:

- Failing to correct the "prevalence of prisoners moving freely between cellblocks" and the "chronic" problem of keeping prisoners' cell doors locked (Doc. 1 at 40; *id.* at 50);

- Failing to confiscate contraband weapons from prisoners, despite the "common knowledge among St. Clair staff that the prisoner population at St. Clair was heavily armed" (*id.* at 41);

- Failing to discipline prisoners found with contraband weapons (*id.*);

- Permitting staff to discourage and retaliate against prisoners who reported incidents and threats of violence (*id.* at 42);

- And understaffing and undertraining St. Clair's correctional staff.[2]

As support, Mr. Wilson alleges that from the beginning of 2017 to the end of 2018, a total of 295 violent incidents occurred in St. Clair. (Doc. 1 at 21). Mr. Wilson provides brief factual accounts of over 100 of those incidents; his accounts describe thirty-six incidents occurring in P or Q block, including seven stabbings in P and Q blocks during the single month of July 2018. (*Id.* at 22 *et seq.*).

Mr. Wilson further alleges that the P and Q blocks served as "hot bay dorms" that Defendants intentionally designated to house individuals "with behavior problems together in general population." (Doc. 1 at 17). The hot bays mostly consisted of inmates with "the highest propensity for violence." (Doc. 1 at 37). Even so, P and Q blocks had no programming to keep prisoners from being idle, which in turn increased the likelihood of violence. (*Id.* at 39). Accordingly,

---

[2] The DOJ investigation underlying *United States v. Alabama* states that in June 2018—less than a year before Mr. Wilson's attack—St. Clair operated with only 28% of the number of correctional officers that the facility required. (Doc. 1-1 at 12). And it states that in 2017, at least one St. Clair correctional officer reportedly worked an average of 90–95 hours per week. (*Id.* at 14).

the rates of violence in P and Q blocks exceeded that in other prison blocks at St. Clair. (*Id.* at 21).

In addition to St. Clair's general understaffing issues, Mr. Wilson alleges that "most of the time," only a single officer monitored the entire area of the P and Q blocks, and that the officer typically did not leave a cubicle. (Doc. 1 at 37). These "cube" officers often received no correctional officer training and frequently slept or paid no attention while on guard duty. (*Id.* at 38). He also alleges that cube officers made "no effort to verify whether a prisoner is actually assigned to the cell that the officer is opening for the prisoner." (*Id.* at 39). He also claims that P and Q blocks lacked adequate camera surveillance and had numerous blind spots with no camera view. (*Id.*).

### C.   Defendants' Knowledge of the Conditions at St. Clair

Mr. Wilson alleges that the following sources provided Defendants with knowledge of the conditions in the P and Q blocks:

- Internal reports accounting for violent incidents (doc. 1 at 30);

- Other ADOC records including duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, and prisoner progress reports (*id.*);

- The "on-the-ground experience at St. Clair" of the conditions alleged (*id.* at 21);

- A 2014 internal security audit of St. Clair by the ADOC Associate Commissioner at that time (*id.* at 31);

- A 2014 prison conditions case brought by a class of St. Clair prisoners, which the parties settled in November 2017, *Cheatham et al. v. Thomas et al.*, No. 4:14-cv-01952-VEH (N.D. Ala.), (*id.* at 31);

- A letter from prison advocates at Equal Justice Initiative to ADOC and Defendant Dunn in June 2018, stating that ADOC had failed to comply with the *Cheatham* settlement agreement (*id.* at 33);

- At least three lawsuits in 2017 challenging dangerous conditions at St. Clair (doc. 1 at 34 n.2);

- A 2017 news interview of a St. Clair correctional officer, in which he admitted that a 24-person cell block at St. Clair could contain 30–40 contraband knives and that contraband weapons were "out of control" (*id.* at 41);

- And a September 2018 letter from Equal Justice Initiative to Defendant Dunn describing violent incidents, the dangerous hot bay system, and widespread contraband weapons at St. Clair (*id.* at 33).[3]

In February 2019, the ADOC Officials allegedly issued a "controlled movement directive." (*Id.* at 34). This directive responded to the stabbing death of a prisoner in St. Clair's Q block by requiring "heightened supervision of staff and prisoners" and "limited out-of-cell time for prisoners in the P and Q blocks at St. Clair." (Doc. 1 at 5). But Mr. Wilson alleges that Defendants "never properly implemented" the controlled movement directive. (*Id.* at 35). Mr. Wilson alleges that Defendants' implementation of the directive "was so poor that a St. Clair correctional officer sergeant was forced to circumvent the chain of command and directly bring the matter to the attention of the ADOC's senior leadership." (*Id.*).

---

[3] The court notes that Mr. Wilson alleges other reports and lawsuits that did not exist until *after* the attack on Mr. Wilson in March 2019, including the DOJ investigation discussed above. But those matters do not show the Defendants' knowledge of St. Clair's conditions *at the time Lawyer attacked Mr. Wilson*.

He alleges that the St. Clair Guards knew of and ignored the controlled movement directive. (*Id.* at 62).

Mr. Wilson alleges that these known lapses in security led to his attack.

## II.   <u>STANDARD OF REVIEW</u>

Under Rule 12(b)(6), a defendant may challenge whether a plaintiff has "stated a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To be plausible on its face, a claim must contain enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In other words, the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court may consider documents attached to the complaint and incorporated by reference in the complaint on a motion to dismiss. *Financial Sec. Assur., Inc.*, 500 F.3d at 1284.

In analyzing a motion to dismiss, the court first must assume the veracity of the well-pleaded factual allegations. *Iqbal*, 556 U.S. at 678. But the court need not accept legal conclusions as true; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Second,

district courts are to draw upon their "judicial experience and common sense" to determine if the complaint states a plausible claim. *Iqbal*, 556 U.S. at 679. The court must be able to "infer more than the mere possibility of misconduct." *Id*. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed. *Id.*

The Eleventh Circuit has stated that the "*Twombly-Iqbal* plausibility standard applies equally" to a prisoner's claims concerning conditions of confinement under 42 U.S.C. §1983. *Bowen v. Warden*, 826 F.3d 1312, 1319 (11th Cir. 2016).

Parties may advance the affirmative defense of qualified immunity at the motion to dismiss stage. *See Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1022 (11th Cir. 2001). A finding in favor of qualified immunity bars the plaintiff's claims. *Id.*

## III.   <u>ANALYSIS</u>

Defendants first argue that Eleventh Amendment sovereign immunity shields them from Mr. Wilson's claims. The court disagrees, and it will address this argument first. The court will then assess whether Mr. Wilson plausibly alleges Eighth Amendment failure-to-protect claims (Counts I and II) and whether qualified immunity shields the Defendants from those claims. Next, the court will address Mr. Wilson's Eighth and Fourteenth Amendment claim for state-created

danger (Count III). Last, the court will address Mr. Wilson's state law negligence claims (Counts IV–VI) and whether state immunity doctrines shield the Defendants from those claims.

### A.    Eleventh Amendment Immunity

The Eleventh Amendment provides sovereign immunity to the states. *Melton v. Abston*, 841 F.3d 1207, 1233 (11th Cir. 2016). Sovereign immunity also applies to state officials "acting in their official capacity," but it does not apply to officials "sued in their *individual* capacities under Section 1983." *Id.* (emphasis in original) (quotation omitted). Mr. Wilson states his federal claims against the Defendants only in their individual capacities under Section 1983. *E.g.*, (doc. 1 at 3).

Yet, Eleventh Amendment immunity may still shield defendants sued in their individual capacities "if the state is the real, substantial party in interest." *Jackson v. Ga. Dept. of Transp.*, 16 F.3d 1573, 1577 (11th Cir. 1994). The Eleventh Circuit stated

> The general test for determining whether the state is the real party in interest . . . is whether the relief sought against the nominal defendant would in fact operate against the state, especially by imposing liability damages that must be paid out of the public fisc.

*Id.* So long as the plaintiff does not "see[k] to impose a liability which must be paid from public funds in the state treasury," his case is an individual-capacity suit. *Id.* (quotation omitted).

Here, Mr. Wilson seeks only compensatory and punitive damages from the

11

Defendants in their individual capacities. (Doc. 1 at 72). As such, the Defendants do not argue that Mr. Wilson seeks to recover state funds or otherwise seek a judgment that would operate against the state. Nor could they because "an award of damages against an official in his personal capacity can be executed only against the officials' personal assets." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Even a state's decision to insure its employees against money damages arising from their personal liability cannot trigger Eleventh Amendment immunity. *See Jackson*, 16 F.3d at 1577 ("There is no use for the insurance protection if the employee is immune from suit by virtue of the state establishing protection.").

So although Alabama law provides that the State's Board of Adjustment will pay "all final judgments awarded" against employees of the Department of Corrections, *see* Ala. Code § 41-9-74(a), the Eleventh Circuit has found that this measure does not create Eleventh Amendment immunity from individual capacity suits. *See Williams v. Bennett*, 689 F.2d 1370, 1378 (11th Cir. 1982). The Eleventh Circuit clarified that Department of Corrections officials remain "individually subject to suits for acts or omissions in connection with their official duties," despite Section 41-9-74(a)'s provision of an "insurance supplement for individuals." *Williams*, 689 F.2d at 1378–79.

Even so, the Defendants argue that the existence of an alternative mechanism for recovery—filing a claim with Alabama's Board of Adjustment for

convicts—triggers Eleventh Amendment immunity. (Doc. 47 at 13; doc. 45 at 8).

But the existence of that remedy does not affect the key issue for Eleventh

Amendment immunity—whether a judgment against the Defendants "must be paid

from public funds" or would operate against the state. *See Jackson*, 16 F.3d at

1577. And Defendants do not argue that Mr. Wilson failed to exhaust his

administrative remedies. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Prisoners

must now exhaust all 'available' remedies" under the Prison Litigation Reform

Act). Defendants provide no authority indicating that the mere existence of an

administrative remedy triggers Eleventh Amendment immunity. So Eleventh

Amendment immunity does not shield the Defendants.

### B.   <u>Eighth Amendment Failure to Protect</u>

Mr. Wilson claims that the Defendants violated the Eighth Amendment by

failing to protect him from unreasonably dangerous conditions at St. Clair, which

led to the attack in March 2019. Defendants assert both that Mr. Wilson fails to

plausibly allege an Eighth Amendment violation and that qualified immunity

shields them from Mr. Wilson's claims.

A plaintiff sufficiently alleges an Eighth Amendment failure-to-protect

claim by stating facts showing "(1) a substantial risk of serious harm; (2) the

defendants' deliberate indifference to that risk; *and* (3) causation." *Hale v.

Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (citation omitted).

And to receive the protection of qualified immunity, government officials must first show that they acted within their discretionary authority when the challenged conduct occurred. *Bowen v. Warden*, 826 F.3d at 1319. Mr. Wilson does not dispute that the Defendants acted within their discretionary authority as to the conduct at issue. (Doc. 1 at 3). So the burden shifts to Mr. Wilson to sufficiently allege that the Defendants violated his constitutional right *and* "that the constitutional right was clearly established at the time of the conduct." *See Bowen*, 826 F.3d at 1319 (quotation omitted). In other words, Mr. Wilson must plausibly allege a violation of his Eighth Amendment rights both to sufficiently state his claim under the motion to dismiss standard and to defeat qualified immunity. *Id.*

As explained below, the court first finds that Mr. Wilson has plausibly alleged that all the Defendants failed to protect him from harm, in violation of his Eighth Amendment rights. In the section that follows, the court finds that the Defendants' conduct violated clearly establish law; so qualified immunity does not shield the Defendants. Accordingly, the court will deny the Defendants' motion to dismiss Mr. Wilson's failure-to-protect claims.

### 1. Constitutional Violation

The Defendants present nearly identical challenges to Mr. Wilson's allegations of his claim's first element—a substantial risk of serious harm. The court will address that element of his failure-to-protect claim first. But each set of

Defendants present separate arguments as to the deliberate indifference and causation elements. So the court will divide its analysis of those elements between each set of Defendants.

### a.  Substantial Risk of Serious Harm

Mr. Wilson alleges a substantial risk of serious harm by stating facts plausibly showing that conditions "were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (internal quotation omitted). Although "occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment[,] confinement in a prison where violence and terror reign is actionable." *Purcell v. Toombs Cnty.*, 400 F.3d 1313, 1320 (11th Cir. 2005)

Mr. Wilson alleges dangerous conditions at St. Clair, including hundreds of violent incidents per year, concentrated violence and poor supervision in the "hot bays" of P and Q blocks, understaffing and undertraining, and prevalent contraband weapons. Comparing these allegations to those in controlling failure-to-protect cases, the court finds these allegations plausibly show a substantial risk of serious harm to Mr. Wilson in St. Clair's P and Q blocks.[4]

In *Hale v. Tallapoosa County*, for example, a plaintiff sued the jail's supervisor after the plaintiff was beaten in an open cellblock and left bleeding and

---

[4] Of course, the court takes the properly pled facts as true at this stage. *Iqbal*, 556 U.S. at 678. But those allegations may not prove to be the facts as the case progresses.

unnoticed by guards, for three hours. 50 F.3d 1579 (11th Cir. 1995). At the summary judgment stage, the Eleventh Circuit found a genuine issue as to a substantial risk for several reasons: the jail placed only one jailer on guard duty at a time; the jail failed to train guards; that the jail was overcrowded; the risk of violence increased during times of overcrowding; and fights between inmates occurred "regularly" within the two years before the plaintiff's injuries, including some fights leaving victims in need of medical care. *Id.* at 1583. The plaintiff also proved a lack of segregation protocols to isolate violent and non-violent prisoners.

Mr. Wilson has alleged facts showing many of the same or similar problems here. He alleges that only one guard observes the entire area of P and Q blocks most of the time; that those officers often undergo no training; that St. Clair is understaffed and overcrowded; and that multiple violent incidents occur per month in P and Q blocks, requiring medical attention. And as in *Hale*, the guards' inattention left Mr. Wilson wounded and alone after the attack, despite his crawling out of his cell and calling for help. *See also Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003) (finding Eighth Amendment violation, in part because of guards' failing to monitor inmates attentively and playing computer games in the guard stand) (abrogated in part on other grounds). He also alleges more egregious facts than those in *Hale*, including widespread contraband weapons; a concentration of violent prisoners and lack of prisoner programming under the "hot

bay" policy; and inmates' regular, unauthorized access to other blocks and cells. So the substantial risk found in *Hale* supports a finding of a sufficiently alleged substantial risk here.

Mr. Wilson's allegations also align with those in *Marsh v. Butler County*, in which several prisoners stabbed and beat the two plaintiffs. 268 F.3d 1014, 1029 (11th Cir. 2001). The Eleventh Circuit affirmed denial of the sheriff's motion to dismiss because the jail had no policy for segregating violent and nonviolent offenders; the jail was overcrowded and understaffed; the jail failed to conduct a regular headcount of prisoners; cell doors had no locks, permitting inmates to "roam freely"; homemade weapons were "readily available"; cells were never locked down or visually inspected; jail staff failed to abide by the jail's written policies; and jail staff failed to discipline prisoners for previous assaults or threats. *Id.*[5]

Again, Mr. Wilson alleges nearly identical problems to those in *Marsh*—overcrowding, understaffing, widespread contraband weapons, and very infrequent oversight and patrols. Unlike *Marsh*, the cells in P and Q blocks *do* have locks; but Mr. Wilson alleges that prison staff routinely violated prison policy by permitting

---

[5] The court notes that both *Marsh* and *Hale* concerned conditions of confinement in a *county jail*, rather than a state prison, as here. But identical legal principles govern jails and prisons because the Eighth Amendment applies equally "to confinement that occurs subsequent to and as a consequence of a person's lawful conviction of a crime." *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1572 (11th Cir. 1985); *see also Bugge v. Roberts*, 430 F. App'x 753 (11th Cir. 2011) (relying on *Hale* and *Marsh* to assess inmate's challenge to state *prison* conditions).

inmates to "move freely" within their cell blocks and into cells they have no authorization to enter. *Compare* (doc. 1 at 40) *with Marsh*, 268 F.3d at 1029 (finding substantial risk, in part because "Jail was not operated in accordance with written policies"). And he alleges that the prison faced "chronic problems" with keeping prisoners' doors locked in the months leading up to the attack in his cell. (Doc. 1 at 50). So the presence of locking doors does little to curb the risk of inmate-on-inmate violence in St. Clair.

Unlike the plaintiffs in *Hale* and *Marsh*, Mr. Wilson does not allege that St. Clair lacks a classification or segregation system to separate violent and nonviolent inmates. But Mr. Wilson alleges that the Defendants' classification policy concentrates the most violent offenders in a maximum-security prison into the barely-supervised and free-ranging general population of P and Q's hot bays. So although Mr. Wilson does not allege a *lack* of classification policy, the alleged hot bay classification policy *increased*, rather than curbed, the substantial risks to Mr. Wilson.

Aside from *Marsh* and *Hale*, the court finds that Mr. Wilson's allegations align with other case law illustrating a substantial risk of serious harm. *See, e.g.*, *Dickinson v. Cochran*, F. App'x 268 (11th Cir. 2020) (finding plausible Eighth Amendment violation based on overcrowding, understaffing, failure to segregate violent and nonviolent prisoners, failure to adequately supervise inmates, and

failure to confiscate weapons and contraband); *Bugge v. Roberts*, 430 F. App'x 753 (11th Cir. 2011). And in addressing almost identical pleadings regarding the dangerous conditions at St. Clair's P and Q blocks, another judge of this court similarly denied a motion to dismiss by ADOC officials and St. Clair officials. *See D.S. v. Dunn, et al.*, No. 2:20-cv-2012-RDP, 2022 WL 1785262, *9 (N.D. Ala. June 1, 2022) (Proctor, J.).

The Defendants respond that Mr. Wilson's allegations show nothing more than a "generalized awareness of risk." (Doc. 47 at 16). For this assertion, they rely on *Marbury v. Warden,* 936 F.3d 1227 (11th Cir. 2019). The pro se plaintiff in *Marbury* suffered an attack in St. Clair's P block—adjacent to Mr. Wilson's Q block—but the Eleventh Circuit found no Eighth Amendment violation stemming from the "generalized risks" present at St. Clair. *Marbury*, 936 F.3d at 1235. However, the holding in *Marbury* rested on "the evidence Marbury has presented": "The only allegation[6] Marbury makes about inmate-on-inmate violence is his statement that he personally witnessed fifteen inmate-on-inmate stabbings during his [6-year] time at St. Clair." *Id.* The Eleventh Circuit noted the plaintiff's failure to prove "specific features of [St. Clair] or its population rendering it particularly violent." *Id.*

---

[6] The Eleventh Circuit considered Marbury's allegations at the summary judgment stage because he was proceeding *pro se*. *Marbury*, 936 F.3d at 1237 ("'Specific facts' alleged in a pro se plaintiff's sworn complaint can suffice to generate a genuine factual issue.").

By contrast, Mr. Wilson has alleged a significantly higher number of violent incidents than in *Marbury*—295 total incidents at St. Clair in 2017 and 2018, at least thirty-six of which occurred in P and Q blocks. And, unlike the plaintiff in *Marbury*, Mr. Wilson alleges "specific features" of St. Clair, like the hot bay system, widespread contraband weapons, and unrestricted prisoner movement that permitted inmate-on-inmate violence. In short, *Marbury* is factually distinguishable.

Similarly, Defendants filed a "Notice of Supplemental Authority," attaching an opinion in which the Chief Judge of this court recently dismissed a St. Clair inmate's Eighth Amendment claims. (Doc. 54) (attaching *McCarley v. Dunn*, No. 4:21-cv-570-LSC, CMECF Doc. 54 (N.D. Ala. Mar. 24, 2022)). But like *Marbury*, *McCarley* bears little factual similarity to this case. The plaintiff in *McCarley* stated a failure-to-protect claim based on warnings he provided to guards overseeing his custody. (Doc. 54-2 at 4). But Mr. Wilson does not base his case on warnings he gave guards of the dangers he faced; rather, he alleges that his injuries stemmed from the widespread and commonly known dangers at St. Clair's Q block. Also, the plaintiff in *McCarley* admitted that ADOC successfully implemented an "extensive classification procedure" and a "'zero-tolerance' policy for contraband" weapons at St. Clair, (doc. 54-2 at 14–15); Mr. Wilson made no such admissions. So the ruling in *McCarley* does not alter this court's finding that

Mr. Wilson plausibly alleges the first element of his failure-to-protect claim—a substantial risk of harm.

### b. Deliberate Indifference and Causation of the ADOC Officials

As stated before, each set of Defendants provides separate challenges to the second and third elements of Mr. Wilson's failure-to-protect claim—i.e., deliberate indifference and causation. So the court will divide its analysis of each of those elements between the Defendants. *See Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) ("Each individual Defendant must be judged separately and on the basis of what that person knows."). The court will begin with the ADOC Officials.

### i. The ADOC Officials' Deliberate Indifference

To allege deliberate indifference, Mr. Wilson must plausibly show the Defendants' "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999).

A prison official possesses subjective knowledge when the official is "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draws the inference." *Bowen v. Warden*, 826 F.3d 1312, 1321 (11th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (internal alterations omitted). A plaintiff may demonstrate subjective knowledge by "inference from circumstantial evidence," including an inference

"from the very fact that the risk was obvious." *Bowen*, 826 F.3d at 1321 (quotation omitted). But the court must be cautious in making such an inference because "only a heightened degree of culpability[] will satisfy the subjective knowledge component." *Id.* (quotation omitted). And the defendants must have objectively disregarded the known risk, "in that he or she knew of ways to reduce the harm but knowingly or recklessly declined to act." *Marbury*, 936 F.3d at 1233 (quotation omitted).

The discussion in *Marsh v. Butler County*, on which the court relied above, also provides helpful guidance as to what allegations show an off-site prison official's subjective knowledge of risks. 268 F.3d 1014. In *Marsh*, the Eleventh Circuit found the jail sheriff had subjective knowledge based on the following sources: a security report from ADOC's jail investigators concerning violent conditions; reports from prisoners; letters from prisoners' lawyers; and a lawsuit filed two months before the attack on the plaintiff, which challenged the jail conditions. *Id.* at 1029.

Mr. Wilson has alleged many of the same facts concerning the ADOC Officials. For example, the 2014 *Cheatham* lawsuit alleged similar dangerous conditions at St. Clair, which Mr. Wilson alleges continued until he was attacked. (Doc. 1 at 33). Dunn began serving as ADOC's commissioner in 2015, during the pendency of that case. (Doc. 1 at 2). And Mr. Wilson alleges that the ADOC

22

Officials knew about the 2017 settlement agreement in the *Cheatham* case, which sought to alleviate many of the same risks at issue in this case. (*Id.* at 32). Also, in June 2018, Equal Justice Initiative allegedly notified ADOC that it had failed to comply with the *Cheatham* settlement agreement. (*Id.* at 33). Finally, Mr. Wilson alleges that St. Clair prisoners filed three separate prison condition lawsuits in 2017, naming Defendant Dunn as a defendant. (Doc. 1 at 32 n.2). As in *Marsh*, the court finds that the prison conditions suits concerning St. Clair and the follow up letters provided subjective knowledge to Defendant Dunn of the dangerous conditions at St. Clair. *See also Dickinson v. Cochran*, 833 F. App'x 268 (11th Cir. 2020) (finding subjective knowledge based in part on DOJ letter to jail officials).

As to Defendant Daniels, Mr. Wilson alleges that an internal audit reported to the ADOC Officials about the conditions at St. Clair in 2014. Notably, the officer conducting this audit held the same Associate Commissioner role that Defendant Daniels currently holds. (Doc. 1 at 31). And Mr. Wilson alleges that Daniels issued the "controlled movement directive" in February 2019, which directly responded to the stabbing death of a prisoner in St. Clair's Q block—the same block in which Mr. Wilson resided and was stabbed—but which was never implemented. (*Id.* at 34). Daniels could not have issued such a directive without subjective knowledge of the risks in those blocks. So these allegations support a finding of Defendant Daniels's subjective knowledge of the dangers at St. Clair.

Based on this "circumstantial evidence," the court finds that Mr. Wilson sufficiently alleged that the ADOC Officials subjectively knew of the substantial risks in St. Clair's P and Q blocks. *See Farmer*, 511 U.S. at 842.

Alternatively, the Supreme Court has stated that courts may "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Marbury*, 936 F.3d at 1234 ("To establish deliberate indifference based on a generalized risk, the plaintiff must show that serious inmate-on-inmate violence was the norm or something close to it.") (internal quotation omitted). The Eleventh Circuit has found an "obvious" risk when the plaintiff's allegations show that "the conditions at the jail [were] longstanding and pervasive." *Marsh*, 268 F.3d at 1029. In *Marsh*, ADOC inspectors had documented the overcrowding, understaffing, failure of locking doors, and other dangerous conditions for at least a year before the plaintiff's injuries. *Id.*

Here, Mr. Wilson alleges "longstanding and pervasive" dangers because he alleges that at least one hundred violent incidents occurred per year at St. Clair for every year after 2012, with a high point of 249 incidents in 2016. (Doc. 1 at 21). And of the hundreds of violent incidents that allegedly occurred at St. Clair in 2017 and 2018, at least thirteen involved a prisoner stabbed in his own cell—facts strikingly similar to the attack Mr. Wilson suffered. (Doc. 1 at 22 *et seq.*). The

history, volume, and similarity of violent incidents at St. Clair "suggest that [the ADOC Officials] had been exposed to information concerning the risk and thus must have known about it." *See Farmer*, 511 U.S. at 842.

Mr. Wilson also alleges that the *Cheatham* plaintiffs identified the same risks that led to his injuries when they filed their case in 2014. And the prevalence of contraband weapons and violence in P and Q blocks was allegedly "a matter of common knowledge among St. Clair staff." (*Id.* at 41). In fact, a correctional officer admitted to a news outlet in early 2017 that contraband weapons were "out of control" and that each cell block could contain thirty to forty contraband knives. (*Id.*). These facts, which show "obvious" risks at St. Clair, *see Farmer*, 511 U.S. at 842, present an alternative ground for finding that the ADOC Officials had subjective knowledge of the risks that Mr. Wilson faced.

The ADOC Officials respond that Mr. Wilson's allegations show nothing more than a "generalized risk" of harm that could not have put them on notice of the dangers at St. Clair. (Doc. 47 at 16). But the Eleventh Circuit has rejected such arguments when the plaintiff "allege[s] specific features of the jail that render it particularly violent." *Dickinson*, 833 F. App'x at 275 (quoting *Marbury*, 936 F.3d at 1235). And Mr. Wilson alleges "specific features" of St. Clair's P and Q blocks making it prone to violence, as explained above. So Mr. Wilson has sufficiently supplemented his allegations of a generalized risk with allegations of the specific

25

dangers at St. Clair's P and Q blocks.

*ii.*     *The ADOC Officials' Disregard of the Risk*

Mr. Wilson must also allege that the ADOC Officials objectively disregarded a substantial risk by "kn[owing] of ways to reduce the harm but knowingly or recklessly declin[ing] to act." *Marbury*, 936 F.3d at 1233 (internal quotation omitted). A prison official's conduct meets this standard when he does "absolutely nothing to alleviate the conditions at the [prison], despite repeated warnings and recommendations for how conditions could be improved." *Marsh*, 268 F.3d at 1029.

Many of Mr. Wilson's allegations closely resemble those in *Dickinson v. Cochran*, in which the Eleventh Circuit affirmed denial of a motion to dismiss the plaintiff's deliberate indifference claim. 833 F. App'x 268 (11th Cir. 2020). The plaintiff in *Dickinson* sued the sheriff and warden, alleging that the officials "failed to implement a proper classification system, adequately train correctional officers regarding classification issues, limit the introduction of contraband weapons by training officers to properly search inmates, and train officers to adequately supervise inmates." *Id.* at 272–73.

Contrary to the ADOC Officials' argument, Mr. Wilson does far more than "parrot some of the words from *Dickinson*" without factual allegations. (Doc. 47 at 18). Rather, Mr. Wilson provides factual allegations of publications and lawsuits

26

that notified the ADOC Officials of St. Clair's dangers and proposed solutions. These sources include the *Cheatham* case, its resulting settlement agreement, and EJI's letters in June and September 2018. Even so, the ADOC Officials allegedly "failed to implement policies and practices" that would have protected him from the dangers. (Doc. 1 at 52). And he alleges that the ADOC Officials failed to adequately staff or train the staff at St. Clair despite knowing of that issue. These allegations resemble those in *Dickinson* and plausibly allege deliberately indifferent conduct.

The ADOC Officials argue that they *did* respond to the risks at St. Clair by issuing the "controlled movement directive" in February 2019. (Doc. 47 at 15). This directive allegedly proposed heightened supervision and out-of-cell time for prisoners in P and Q blocks. (Doc. 1 at 5).

But Mr. Wilson alleges that the ADOC Officials "never properly implemented" the controlled movement directive. (Doc. 1 at 35). In fact, he alleges that a sergeant at St. Clair went up the "chain of command" to notify both the St. Clair Officials and the ADOC Officials of the failed implementation of the directive. (*Id.*). The Eleventh Circuit has stated that an official's "fail[ing] to ensure that his direct subordinates followed the policies he established" can sustain a failure-to-protect claim. *LaMarca v. Turner*, 995 F.2d 1526, 1537 (11th Cir 1993). The ADOC Officials' mere enactment of a directive that their own

subordinates notified them was never implemented or enforced reflects that they "recklessly disregarded the necessary means to protect inmate safety." *See LaMarca*, 995 F.2d at 1538. So the court finds that the allegedly unenforced controlled movement directive did not constitute a reasonable response to the risks at the P and Q blocks.

In sum, the court finds that Mr. Wilson has sufficiently alleged the ADOC Officials' deliberate indifference to the substantial risks at St. Clair.

### iii.    Causation as to the ADOC Officials

For the third element of his failure-to-protect claim—causation—Mr. Wilson must allege facts showing that the prison officials "were personally involved in acts or omissions that resulted in the constitutional deprivation." *Hale*, 50 F.3d at 1582.

Because the ADOC Officials served as *supervisors*, Mr. Wilson may allege causation by showing a "causal connection" in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) when the supervisor's "custom or policy results in deliberate indifference to constitutional rights"; or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360.

28

The court finds that Mr. Wilson has sufficiently alleged supervisory causation under both the first and third avenues of alleging a causal connection. As to a history of widespread abuse, the court has already explained the alleged years-long violence, widespread contraband weapons, dangerous hot bay policy, unauthorized entry by prisoners into others' cells, and the understaffing and undertraining issues at St. Clair. These facts constitute "widespread abuse" because they show "obvious" dangers that far surpass "isolated occurrences." *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quotations omitted). And they closely resemble those in cases finding supervisory causation. *See Hale*, 50 F.3d at 1584 (making this finding based on officials' failure to adequately segregate violent prisoners, train jailers, and provide adequate supervision and monitoring).

Alternatively, the court has explained that the dangers in the P and Q blocks result either from the ADOC Officials' failure to create policies to remedy those issues or from their knowing failure to enforce the policies they did create, such as the controlled movement directive. Meanwhile, the ADOC Officials allegedly received notice that St. Clair staff was not honoring the directive and was not correcting the dangerous conditions. The court finds that the ADOC Officials' knowing failure to implement or enforce its policies supports an inference that they "knew that [their] subordinates would act unlawfully and failed to stop them from doing so." *See Cottone*, 326 F.3d at 1360.

29

In sum, Mr. Wilson has sufficiently alleged every element of his Eighth Amendment failure-to-protect claim against the ADOC Officials. The court will analyze whether qualified immunity shields the Officials after addressing the Eighth Amendment liability of the remaining Defendants.

### c. Deliberate Indifference and Causation as to the St. Clair Officials

The court now addresses whether Mr. Wilson has sufficiently alleged the second and third elements of his failure-to-protect claim as to the St. Clair Officials—Defendants Warden Jones, Assistant Warden Givens, and Assistant Warden Brooks. Mr. Wilson alleges that the St. Clair Officials bore the responsibility of ensuring adequate levels of staff and adequate training of staff. (Doc. 1 at 6). And their jobs entailed implementing safety procedures like the "controlled movement directive," and making decisions about housing assignments, including those assigned to the hot bays at St. Clair.

### i. The St. Clair Officials' Deliberate Indifference

The St. Clair Officials only challenge whether Mr. Wilson sufficiently alleges their "subjective knowledge" of substantial risks; so the court will address only that prong of the deliberate indifference analysis.

Like the ADOC Officials, the St. Clair Officials argue that the facts alleged did not put them "on notice that Plaintiff faced a substantial risk of serious harm in Q block." (Doc. 45 at 12). But the court has already outlined three cases—*Marsh*,

*Hale*, and *Dickinson*—indicating that matters like an ADOC investigator report, prisoner complaints, prison advocate letters, and prisoner lawsuits sufficiently put prison officials on notice of unconstitutional conditions that could result in violence. *See, e.g.*, *Marsh*, 268 F.3d at 1027–28.

As previously explained, nearly identical forms of notice exist in this case: an internal audit report in 2014; the *Cheatham* case in 2014; numerous lawsuits in 2017; and the controlled movement directive all addressed the egregious conditions at St. Clair. *See Dickinson*, 833 F. App'x 268 (finding subjective knowledge based primarily on DOJ letter to jail officials). In particular, Assistant Warden Brooks was a named Defendant in the *Cheatham* case; so he was aware of the dangers alleged in that case. And Warden Jones allegedly helped develop the controlled movement directive in February 2019, which entailed learning about the poor supervision and violence in P and Q blocks. (Doc. 1 at 34). Assistant Wardens Givens and Brooks received the directive, so they had knowledge of those risks and proposed solutions as well. The court finds that these documents plausibly show the St. Clair Officials' subjective knowledge of the risks at St. Clair's P and Q blocks.

Mr. Wilson also alleges that internal incident reports, ADOC investigations, and officer duty reports notified the St. Clair Officials about the hundreds of violent incidents at St. Clair in 2017 and 2018. (*Id.* at 31). The St. Clair Officials'

argue that these allegations merely show "imputed knowledge." (Doc. 45 at 13,

citing *Burnette*, 533 F.3d at 1331). But the St. Clair Officials' alleged job duty of

maintaining prison security indicates that they would have received these

documents and considered their safety implications. *See Lane v. Philbin*, 835 F.3d

1302, 1310 (11th Cir. 2016) (finding that, "based on their job titles," warden of

security and deputy warden of security "were in a position to be subjectively aware

of security-related issues" in the prison).

Alternatively, the court finds that Mr. Wilson has alleged "longstanding and

pervasive" obvious risks at St. Clair, permitting the court to infer that the St. Clair

Officials possessed subjective knowledge. *See Marsh*, 268 F.3d at 1029; *see also*

*Farmer*, 511 U.S. at 842. The court has already highlighted Mr. Wilsons'

allegations of hundreds of violent incidents per year and widespread knowledge of

contraband weapons and other dangerous conditions. Because the St. Clair

Officials bore the responsibility of managing prison safety and officer training,

these allegations permit the court to infer that the St. Clair Officials "knew of a

substantial risk from the very fact that the risk was obvious." *See Farmer*, 511 U.S.

at 842.

The court also rejects the St. Clair Officials' argument that Mr. Mr. Wilson

fails to allege subjective knowledge because his factual allegations do not put his

claims "in context." (Doc. 45 at 11). The St. Clair Officials insist that Mr. Wilson

must allege the "physical size, layout, [and] population" of St. Clair and the P and Q blocks, as well as whether previous violent incidents involved weapons and the failure to lock cell doors. (*Id.*). But Mr. Wilson *has* alleged the population of roughly 900 prisoners at St. Clair and the prison guards' lack of surveillance ability because of the physical layout and blind spots in Q block. *E.g.*, (doc. 1 at 38). He has also alleged factual accounts describing the type of weapons used and locations of over 100 violent incidents at St. Clair in 2017 and 2018. The court finds that Mr. Wilson's factual allegations provide enough context to plausibly show the St. Clair Officials' subjective knowledge the risks he faced.

### ii. Causation as to the St. Clair Officials

For the third element of his claim, Mr. Wilson sufficiently alleges a "causal connection" in two of the three possible avenues: first, he shows widespread abuse that the St. Clair Officials ignored; and second, he alleges facts supporting an inference that the St. Clair Officials knew their subordinates had acted unlawfully and failed to stop them from doing so. *See Cottone*, 326 F.3d at 1360.

First, the court has already explained that Mr. Wilson's allegations constitute "widespread abuse" because they show "obvious" dangers that far surpass "isolated occurrences." *See Hartley*, 193 F.3d at 1269. The St. Clair Officials respond that Mr. Wilson fails to show widespread abuse because he alleges no previous violent incidents specifically resulting from "a correctional officer's

failure to lock a cell door during a prisoner count or remote unlocking of an inmate's cell." (Doc. 45 at 11).

But Mr. Wilson has provided such allegations. His complaint recounts hundreds of violent incidents, thirteen of which concerned a prisoner stabbed in his own cell, and thirty-three of which occurred in P and Q blocks. (Doc. 1 at 22 *et seq*.). And he alleges that the failures to keep prisoners isolated to their cell blocks and to keep their cell doors locked were "chronic," "prevalent," and widely known to St. Clair staff, including the St. Clair Officials. (Doc. 1 at 53). Further, the court cannot dismiss Mr. Wilson's claim simply because he fails to allege prior incidents sharing a high degree of specificity with his own injuries. Rather, "an Eighth Amendment violation can arise from unsafe conditions of confinement even if no assault or similar physical injury has yet to occur." *Marsh*, 268 F.3d at 1034 (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). So the court finds causation as to the St. Clair Officials because they ignored widespread abuses at St. Clair.

And second, the court alternatively finds causation as to the St. Clair Officials because they knew that their subordinates failed to protect St. Clair inmates from substantial risks but did nothing to correct their behavior. For example, the St. Clair Officials allegedly "knew that correctional officers at St. Clair routinely leave previously locked cell doors open or unlocked after a prisoner count," but they did nothing to correct the problem. (Doc. 1 at 54). They also

allegedly "permitted widespread contraband weapons to proliferate at St. Clair and took no meaningful action to curtail" the weapons and violence. (Doc. 1 at 42). And like the ADOC Officials, the St. Clair Officials allegedly knew that St. Clair guards failed to enforce the controlled movement directive, but they still "failed to implement or enforce" it. (Doc. 1 at 54). The court finds the St. Clair Officials' failure to correct their subordinates' known security failures plausibly shows causation.

In sum, the court finds that Mr. Wilson plausibly alleged every element of his failure-to-protect claim against the St. Clair Officials. The court will analyze whether qualified immunity shields the St. Clair Officials after addressing the St. Clair Guards' Eighth Amendment liability.

### d. Deliberate Indifference and Causation as to the St. Clair Guards

Mr. Wilson alleges that the St. Clair Guards failed to prevent the attack in his cell, in violation of the Eighth Amendment. The Guards include Defendant Barlow, the cube officer on duty the evening of the attack, and Defendants Jones and Valdez, the officers conducting the prisoner count in Q block on the evening of the attack. (Doc. 1 at 12). Because he was asleep when Mr. Lawyer began attacking him, Mr. Wilson alleges two "possible explanations" for how Mr. Lawyer entered his cell: either Officers Jones and Valdez violated prison policy by failing to re-lock his cell door after prisoner count, or Cube Officer Barlow

improperly "buzzed" Mr. Lawyer into his cell. (Doc. 1 at 18).

The St. Clair Guards argue that Mr. Wilson fails to allege their subjective knowledge of a "strong likelihood of injury." (Doc. 45 at 16) (quoting *Marbury*, 936 F.3d at 1238). And they argue that their alleged conduct amounts to, "at most, negligence," which will not sustain a failure to protect claim. (Doc. 45 at 18). The court disagrees with both arguments.

### i.   The St. Clair Guards' Subjective Knowledge

As an initial matter, the court has already detailed Mr. Wilson's allegations that plausibly show subjective knowledge by the Officials of the substantial risks at St. Clair based on inference "from circumstantial evidence" and "from the very fact that the risk was obvious." *See Farmer*, 511 U.S. at 842. Guards, like supervisory officials, may face Eighth Amendment liability based on knowledge of such obvious risks. *See Smith v. Salter*, 794 F. App'x 817, 820 (11th Cir. 2019) (assessing whether prison guard subjectively knew of "generalized, substantial risk of serious harm from inmate violence") (quoting *Hale*, 50 F.3d at 1583).

Relevant here, Mr. Wilson alleges that a non-defendant St. Clair guard explained in a 2017 news interview that a St. Clair cell block could contain 30–40 contraband weapons, and he described the contraband situation as "out of control." (Doc. 1 at 41). Likewise, Mr. Wilson alleges the widely-known and "prevalent" problem of prisoners' unauthorized movement between cell blocks and into other

prisoners' cells, which at times resulted in violence. (Doc. 1 at 61). And he alleges that the St. Clair Guards knew about and disregarded the controlled movement directive, which was aimed at correcting the lack of supervision and unrestricted prisoner movement at St. Clair. (Doc. 1 at 61). These allegations plausibly show the Guards' knowledge of the risks Mr. Wilson faced.

The court also finds it plausible that the Guards' on-the-ground experience alerted them to the hundreds of violent incidents occurring at St. Clair each year, including a high concentration of incidents in the P and Q hot bays. The St. Clair Guards argue that these incidents did not reflect circumstances like the attack on Mr. Wilson. But Mr. Wilson alleges dozens of stabbings occurring in inmates' cells, just like his case presents. Based on these allegations, the court finds it plausible to infer that the St. Clair Guards knew of the dangerous conditions Mr. Wilson alleges prior to his attack.

Finally, Mr. Wilson need not allege that the Guards knew that he faced a particular risk of attack specifically from Mr. Lawyer. Because the Guards possessed knowledge of an obvious risk, they may not "escape liability" simply because they did not know "the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *See Farmer*, 511 U.S. at 843. Rather, a plaintiff may sufficiently allege prison guards' subjective knowledge by showing that the guards knew their conduct "created a *generalized,*

37

substantial risk of serious harm from inmate violence." *Smith v. Salter*, 794 F.

App'x 817, 820 (11th Cir. 2019) (quoting *Hale*, 50 F.3d at 1583) (emphasis

added).

Here, Mr. Wilson plausibly alleges that the St. Clair Guards knew of violent

inmate attacks that occurred regularly, in part, because of guards' chronic failures

to lock cell doors and to determine whether one inmate possessed authorization to

enter the cell of another inmate. Despite that knowledge, the St. Clair Guards

allegedly made the same failures on the evening Lawyer attacked Mr. Wilson. So

even if Mr. Wilson failed to plausibly allege the Guards' knowledge of risks that

he personally faced, that failure does not doom his claims because he plausibly

alleges that the Guards knew their conduct on the evening of Lawyer's attack

would create a *generalized* risk of serious harm from inmate violence. *See Smith*,

794 F. App'x at 820.

### ii.    *The St. Clair Guards' Conduct*

The St. Clair Guards also argue that their alleged conduct amounts to no

more than negligence. (Doc. 45 at 17). The Eleventh Circuit has stated that merely

negligent conduct cannot sustain an Eighth Amendment failure-to-protect claim.

*See Marbury*, 936 F.3d at 1238.

But Mr. Wilson plausibly alleges facts showing more than mere negligence

in his failure-to-protect claim (Count II). For one thing, Mr. Wilson alleges the St.

38

Clair Guards knew about the controlled movement directive, adherence to which would have prevented his injuries; yet, they did not follow its mandate. (Doc. 1 at 61). Knowing violation of prison policy is a relevant fact for consideration of Eighth Amendment liability. *See Rodriguez v. Sec'y for Dept. of Corr.*, 508 F.3d 611, 623 (11th Cir. 2007) (finding that officer's violating "established protocol for handling an inmate's life-threatening security concerns" supported Eighth Amendment liability); *Marsh*, 268 F.3d at 1029.

Further, according to the Complaint, Cube Officer Barlow *intentionally* buzzed Lawyer into Mr. Wilson's cell, without confirming that Mr. Lawyer should enter the cell. Mr. Wilson alleges that Officer Barlow's acts accorded with the general failure of cube officers across the prison to verify whether a prisoner was authorized to enter a cell before buzzing them in. (Doc. 1 at 39). Carelessly admitting Mr. Lawyer into Mr. Wilson's cell, in a cell block containing St. Clair's most violent inmates and widespread contraband weapons, and in which violent incidents regularly result from inmates' improper entry into other inmates' cells, plausibly rises above the level of negligence.

As to Guards Jones and Valdez, leaving Mr. Wilson's door unlocked may have been a mere omission. But Mr. Wilson alleges that Jones and Valdez knowingly violated prison policy requiring that guards leave cell doors as they found them when conducting prisoner count. (Doc. 1 at 18). As discussed above,

Jones and Valdez allegedly knew about the egregious dangers outside Mr. Wilson's cell; his locked door was the only thing keeping him safe while he slept. Their failure to re-lock the door constitutes an "objectively unreasonable" response to the known dangers in the Q block. *See Rodriguez*, 508 F.3d at 620.

In sum, the court finds that Mr. Wilson plausibly alleges that the St. Clair Guards—like all other Defendants—violated the Eighth Amendment by failing to protect him from the attack by Mr. Lawyer. The court will now consider whether the Defendants violated clearly established law under the qualified immunity analysis.

### 2. *Clearly Established Law*

As explained above, Mr. Wilson has sufficiently alleged that the Defendants violated his constitutional right. But to defeat qualified immunity, Mr. Wilson must also show that the Defendants' conduct violated "clearly established" law "at the time of the conduct." *See Bowen*, 826 F.3d at 1319 (quotation omitted).

An official violates clearly established law only when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Cottone v. Jenne*, 326 F.3d 1352, 1359 (11th Cir. 2003) (citation omitted) (abrogated in part on other grounds). In the Eleventh Circuit, a plaintiff may show clearly established law in one of three ways: (1) by showing "that a materially similar case has already been decided"; (2) by showing "that a broader, clearly

established principle should control the novel facts"; *or* (3) by showing that the defendant's conduct "so obviously violates the constitution that prior case law is unnecessary." *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019).

Under the first option, the Eleventh Circuit has clarified that "materially similar" precedent exists

> when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly-situated official could believe that the factual differences between the precedent and the circumstances facing the official *might* make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent.

*Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1032 (11th Cir. 2001). The Eleventh Circuit has reiterated that "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017) (quotation omitted).

Here, the Defendants present similar arguments as to clearly established law; so the court will not divide its analysis between them. For the reasons explained below, the court finds Mr. Wilson sufficiently alleged that the Defendants violated clearly established law.

*Marsh* and *Hale*, which the court has already discussed, provide the most relevant case law to Mr. Wilson's claims. In *Marsh*, the Eleventh Circuit found a plausible Eighth Amendment violation based on facts including the officials' failure to segregate violent and nonviolent inmates; overcrowding "at times";

41

routine understaffing; non-functioning door locks, which permitted inmates "to roam freely"; insufficient prisoner inspection and count; and failure to operate the jail in accordance with written policies. *Marsh*, 268 F.3d at 1029. The Eleventh Circuit decided *Marsh* in 2001, seventeen years before the attack on Mr. Wilson.

Although Mr. Wilson's allegations do not precisely mirror the list in *Marsh* in every respect, he has alleged many of the same facts, including constant overcrowding, understaffing, "chronically" failing door locks, free roaming prisoners, and failure to operate the jail in accordance with written policies. Notably, the plaintiff in *Marsh* presented "no allegations of past serious injuries to prisoners at the Jail." *Marsh*, 268 F.3d at 1033. By contrast, Mr. Wilson alleges hundreds of violent incidents per year at St. Clair. The court finds no reasonable official could "fairly distinguish" these facts from those in *Marsh*. *See Gaines*, 871 F.3d at 1209.

The court also finds materially similar precedent in *Hale*. 50 F.3d 1579. In that case, the Eleventh Circuit denied the prison officials' motion for summary judgment because they permitted inmate-on-inmate violence that "occurred regularly when the jail was overcrowded, as it was during May 1990 and the two preceding years," and because that violence led to injuries requiring "medical attention and even hospitalization on occasion." *Hale*, 50 F.3d at 1583. Mr. Wilson has alleged far more egregious conditions, including hundreds of brutal violent

incidents and homicides in the two years leading up to the attack on him. So *Hale* further shows that the Defendants violated clearly established law.

And the Eleventh Circuit has recently found that *Marsh* and *Hale* provide clearly established law as to similar conduct by prison officials. In *Dickinson v. Cochran*, the Circuit Court stated, "[Defendants] had fair warning under *Hale* and *Marsh* that their alleged failure to correct the overcrowding, inmate classification, and contraband weapons, which resulted in inmate-on-inmate abuse at the jail, violated a clearly established right." *Dickinson*, 833 F. App'x at 274; *see also Bugge*, 430 F. App'x at 760 n.8 (same); *D.S. v. Dunn*, 2022 WL 1785262, *11–12 (denying ADOC and St. Clair officials' request for qualified immunity as to similar claims because of *Hale*, *Marsh*, and *Dickinson*).[7]

The Defendants argue that Mr. Wilson fails to identify a binding case with "inmate violence resulting from the assailant gaining unauthorized access through a correctional officer's failure to lock an inmate's cell door or by remotely unlocking a cell door." (Doc. 45 at 17). But the qualified immunity standard does not require Mr. Wilson to present case law showing "the very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Marsh*, 268 F.3d at 1032 ("Every fact need not be identical."). Further, Mr.

---

[7] Of course, *Dickinson* and *Bugge*—as unpublished opinions—cannot set clearly established law. *See Trotter v. Shull*, 720 F. App'x 542, 545 (11th Cir. 2017) (finding unpublished cases "incapable of clearly establishing law"). But they do show the Eleventh Circuit's recognition that clearly established law existed as of 2017 as to the Officials' conduct under *Hale*, *Marsh*, and *Dickinson*—cases on which this court also relies.

Wilson's claim rests on far more than failing locks and unauthorized entry into prisoners' cells; Defendants also allegedly failed to correct the presence of widespread contraband weapons, understaffing issues, and unrestricted prisoner movement that resulted in numerous violent incidents.

The ADOC Officials present the distinct argument that Mr. Wilson only provided precedent involving "claims against *on-site personnel*. . . . Claims against wardens and other on-site personnel cannot serve as 'materially similar cases' providing 'clearly established law' for claims against *statewide* supervisory officials." (Doc. 52 at 5) (emphasis added). As support, the ADOC Officials cite Judge Tjoflat's concurring opinion in *Wade v. United States*, in which he states: "The key difference between these cases in my estimation is . . . *who* is being sued and under what theory of law." 13 F. 4th 1217, 1231 (11th Cir. 2021).

But the court find's Judge Tjoflat's concurrence—which does not bind this court—inapplicable to Mr. Wilson's claims. Judge Tjoflat concurred to point out that the official in that case played a different "role in this incident" than the officials in the cases that the plaintiff relied on for clearly established law. *Wade*, 13 F. 4th at 1231. But the ADOC Officials played the *same* policymaking role that the sheriffs and official defendants played in the cases on which the court has relied. *E.g.*, *Marsh*, 268 F.3d at 1024. For instance, in *Hale*, the Eleventh Circuit reversed the lower court by finding a genuine issue as to whether the sheriff should

44

face liability for his role of "making final policy for the jail," which is the same

basis for Mr. Wilson's claims against the ADOC Officials. *Compare Hale*, 50 F.3d

at 1582 *with* (Doc. 1 at 3). And the Eleventh Circuit's analysis in those cases did

not turn on the prison officials' "on-site" status. So Judge Tjoflat's comments

about "who is being sued" do not undercut the relevance of the clearly established

law in *Marsh* and *Hale* to the ADOC Officials' conduct.

Finally, the court finds that, even if Mr. Wilson had not provided "materially

similar precedent" supporting clearly established law, he has shown "that a

broader, clearly established principle should control the novel facts" of his case.

*See Corbitt v. Vickers*, 929 F.3d 1304, 1312(11th Cir. 2019). As the Supreme Court

has stated,

> Having incarcerated persons with demonstrated proclivities for
> antisocial criminal, and often violent, conduct, having stripped them
> of virtually every means of self-protection and foreclosed their access
> to outside aid, the government and its officials are not free to let the
> state of nature take its course.

*Farmer*, 511 U.S. at 833 (internal quotations and alterations omitted).

Taken as true, Mr. Wilson has alleged that his injuries resulted from

appalling conditions of widespread violence, contraband weapons, understaffing,

and unauthorized prisoner movement. He alleges that the Officials knew of these

conditions and either failed to create policy or failed to enforce and follow their

policies to remedy the conditions. And he alleges that the Guards either left Mr.

Wilson's door unlocked to expose him to that known violence or permitted another inmate into his cell to commit it. In other words, the Defendants allegedly stripped Mr. Wilson of his safety and "let the state of nature take its course." *See Farmer*, 511 U.S. at 833. The broader principle set forth in *Farmer* controls these allegations; so qualified immunity does not apply.

Because Mr. Wilson plausibly alleges that Defendants violated the Eighth Amendment by failing to protect him from the attack by Mr. Lawyer, and because their conduct violated clearly established law, the court will deny Defendants' motion to dismiss Mr. Wilson's failure-to-protect claims (Count I and Count II) on qualified immunity grounds.

### C.   <u>Mr. Wilson's Claim for "State Created Danger"</u>

Count III of Mr. Wilson's complaint states that the ADOC Officials and St. Clair Officials violated the "Eighth and Fourteenth Amendment" by "knowingly creating an environment that posed a substantial risk" to Mr. Wilson. (Doc. 1 at 62). Mr. Wilson titles this count "State-Created Danger." (*Id.*).

Although the parties did not brief this claim in great detail, the court construes Defendants' briefs to challenge this claim on two grounds: (1) "the Eighth Amendment should supersede any due process analysis because Plaintiff is incarcerated" (doc. 45 at 19); and (2) "the Eleventh Circuit does not recognize such a claim [for state-created danger]" (doc. 47 at 19). The court disagrees, based on

the case law set forth below.

In general, the Eighth Amendment's cruel and unusual punishment clause—not the Fourteenth Amendment—provides constitutional protection as to prison conditions. The Eighth Amendment requires prison officials to ensure that prisoners receive adequate food, clothing, shelter, and medical care; officials must also "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832. By contrast, the Fourteenth Amendment's due process clause generally "prevent[s] the government from abusing its power, or employing it as an instrument of oppression," rather than affording an "affirmative right to governmental aid." *DeShaney v. Winnebago Cnty. Dept. of Soc. Serv.*, 489 U.S. 189, 196 (1989) (quotations and alterations omitted). So, typically, the Eighth Amendment "serves as the primary source of substantive protection to convicted persons." *Whitley v. Albers*, 475 U.S. 312, 327 (1986).

But the Supreme Court has maintained that prisoners may state a substantive due process claim under the Fourteenth Amendment concerning prison conditions:

> When the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by *the Eighth Amendment and the Due Process Clause.*

*DeShaney*, 489 U.S. at 200 (emphasis added). The lower courts have described such a claim as one for a "state-created danger." *E.g.*, *Wyke v. Polk Cnty. Sch. Bd.*,

129 F.3d 560, 567 (11th Cir. 1997). As the Eleventh Circuit explained, "[t]he language of *DeShaney* does indeed leave room for state liability where the state creates the danger or renders an individual liable to it." *Id.*

Defendants correctly note that subsequent Eleventh Circuit case law has significantly curtailed the state-created danger claims for those in the "*non-custodial setting*." *Vaughn v. City of Athens*, 176 F. App'x 974, 976 n.1 (11th Cir. 2006); *see also Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003)). The Eleventh Circuit has clarified that a plaintiff in a non-custodial setting states a viable substantive due process claim "only when the officials cause harm by engaging in conduct that is arbitrary or conscience shocking." *Perez-Guerrero v. U.S. Atty. Gen.*, 717 F.3d 1224, 1234 (11th Cir. 2013) (internal quotation omitted).

But those cases have not overruled—and in fact, they have preserved—state created danger claims for plaintiffs alleging harms they suffered *while in state custody*: "Only custodial relationships automatically give rise to a governmental duty, under substantive due process, to protect persons from harm by third parties." *Perez-Guerrero*, 717 F.3d at 1233; *see also White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999) (stating the same).

Admittedly, these cases do little to clarify the *standard* for what constitutes a state-created danger as to custodial plaintiffs like Mr. Wilson. In fact, much of the

state-created danger case law concerns dissimilar factual scenarios such as violence against prisoners resulting from rioting or noncompliant behavior, *e.g.*, *Williams v. Burton*, 943 F.3d 1572, 1576 (11th Cir. 1991), or students injured while on school campuses, *e.g.*, *Davis v. Carter*, 555 F.3d 979, 982 (11th Cir. 2009). To this point, the ADOC Officials argued *only* in their *reply brief* that Mr. Wilson "fails to cite a single case recognizing an individual-capacity claim for state-created danger against supervisory officials in factually similar circumstances." (Doc. 52 at 3–4). But the ADOC Officials failed to raise that argument in their original motion to dismiss brief.[8] So the court declines to dismiss Mr. Wilson's claims on that ground. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court.") (quotation omitted).

In sum, the cases cited above defeat Defendants' arguments that the Eighth Amendment "supersedes," or that the Eleventh Circuit has discarded state-created danger claims as to custodial plaintiffs. So the court will deny the ADOC Officials and St. Clair Officials' motion to dismiss Mr. Wilson's state-created danger claim (Count III).

---

[8] The court notes this single sentence in the ADOC Officials' *original* motion to dismiss brief: "Even if [a state-created danger] claim exists, Plaintiff fails to allege how any ADOC Official individually bears responsibility for another inmate's stabbing of Plaintiff." (Doc. 47 at 19). Because it lacked further explanation, the court does not construe this statement to challenge whether Mr. Wilson could provide factually similar case law, as the Officials' reply brief argues. So the court does not find that the Officials' original brief raised this issue.

### D. <u>Mr. Wilson's State Law Claims</u>

Finally, Mr. Wilson claims that the Defendants' failure to protect him amounted to negligence under Alabama state law (Counts IV–VI). The Defendants respond that State immunity under Section 14 of Alabama's State Constitution and State-agent immunity shield them from liability for Mr. Wilson's state claims.[9] They alternatively argue that Mr. Wilson has failed to allege plausible negligence claims against them; specifically, the Officials argue that Mr. Wilson fails to allege a duty, and all Defendants argue that he failed to allege proximate causation. The court disagrees on all accounts.

### 1.  *State Immunity Under Section 14*

Article 1, Section 14 of the Alabama Constitution extends State immunity to State officers sued *in their official capacities*. *Ex parte Pinkard*, -- So. 3d --, 2022 WL 1721483, *5 (Ala. 2022). But as explained above, Mr. Wilson sues the Defendants in their individual capacities only. (Doc. 1 at 3). Even so, Alabama's State immunity *previously* extended even to officers sued in their individual capacities "when the duty allegedly breached is owed solely because of the officer or employee's official position." *Ex parte Cooper*, -- So. 3d. --, 2021 WL 4471018, *1 (Ala. 2021) (citing *Barnhart v. Ingalls*, 275 So. 3d 1122, 1125 (Ala. 2018)). Defendants rely on this authority. (Doc. 47 at 24; doc. 45 at 7).

---

[9] State immunity under § 14 and State-agent immunity do not shield Defendants from federal claims under § 1983. *See Ex parte Wilcox Cnty. Bd. Educ.*, 285 So. 2d 765, 779 (Ala. 2019).

But the Alabama Supreme Court overturned those cases during the pendency of Defendants' motions. *See Ex parte Pinkard*, -- So. 3d --, 2022 WL 1721483, *7 (Ala. 2022) (overruling *Barnhart* and *Cooper*). State immunity now applies only "if a claim against an officer seeks relief that would directly affect a contract or property right of the State—such as by demanding money from the State treasury, requesting special performance of the State's contractual obligations, or asking the court to quiet title to State lands." *Ex parte Pinkard*, 2022 WL 1721483, at *5 (quotation omitted). As discussed in relation to Eleventh Amendment immunity, Mr. Wilson seeks damages directly from Defendants in their individual capacities, and he seeks no other forms of relief that *Pinkard* discussed. So State immunity no longer protects the Defendants.

### 2. *State-Agent Immunity*

Next, all Defendants assert that State-agent immunity shields them from Mr. Wilson's negligence claims.

In *Ex parte Cranman*, the Alabama Supreme Court announced a two-step, burden-shifting test for State-agent immunity. 792 So. 2d 392 (Ala. 2000) (plurality); *see Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000) (applying *Cranman* in majority opinion). First, the defendant must show that he engaged in immunized conduct. Here, the court need not decide whether the Defendants engaged in immunized conduct because, even if they did, Mr. Wilson has met his burden of

showing that a *Cranman* exception applies.

Even if the defendant shows that they engaged in immunized conduct, the plaintiff may prove that one of the exceptions to State-agent immunity applies so as to avoid the shield of immunity:

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; *or*

> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte Cranman*, 792 So. 3d at 405. State-agent immunity will not apply "unless the inapplicability of all the *Cranman* exceptions is clear from the face of the complaint." *Odom v. Helms*, 341 So. 3d 220, 229 n.3 (Ala. 2020) (citation omitted).

The court finds that both *Cranman* exceptions apply to Mr. Wilson's claims. The Eleventh Circuit has interpreted *Cranman*'s first exception to preclude State-agent immunity "if [defendants] violated [plaintiff]'s constitutional rights." *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019).[10] Because the court has found it plausible that the Defendants violated Mr. Wilson's Eighth Amendment rights, the first exception applies; so State-agent immunity does not apply to the Defendants

---

[10] Although the Alabama Supreme Court has not validated the Eleventh Circuit's interpretation of the first *Cranman* exception, federal courts have generally adopted it. *E.g.*, *Foster v. Maloney*, 785 F. App'x 810, 819 (11th Cir. 2019); *D.S. v. Dunn*, 2022 WL 1785262, *12; *Huffman v. Dunn*, No. 4:20-CV-01293-CLM, 2021 WL 2533024, *8 (N.D. Ala. June 21, 2021).

at this stage.

Alternatively, the court finds that Mr. Wilson has plausibly alleged "willful" or "malicious" conduct, beyond the Defendants' authority. *See Ex parte Cranman*, 792 So. 3d at 405. Under this exception, a prisoner may defeat State-agent immunity—even when proceeding under a negligence theory—by sufficiently alleging that prison officials acted knowingly or in violation of prison policy. *See Ala. Dept. of Corr. v. Thompson*, 855 So. 2d 1016, 1021 (Ala. 2003) ("[Defendant] willfully violated a written regulation. . . . Therefore, [Defendant] acted willfully or beyond her authority."). In the Eighth Amendment analysis above, the court explained that the Officials knowingly failed to correct substantial safety risks and failed to enforce their own policies. And the court found the Guards violated prison policy by permitting an unauthorized inmate into Mr. Wilson's cell, while knowing of the general dangers in the Q block. Those allegations trigger *Cranman*'s second exception; so State-agent immunity does not apply.

### 3. *Mr. Wilson's Negligence Claims*

Mr. Wilson alleges that the ADOC Officials and the St. Clair Officials breached a duty to protect him from the dangers his complaint asserts, as well as failing to implement and enforce safety policies, such as the controlled movement directive. (Doc. 1 at 64 *et seq*.). And he alleges that the St. Clair Guards breached a duty to keep him safe by either failing to re-lock his cell door or by wrongly

permitting Mr. Lawyer to enter his cell. (*Id.* at 69).

To establish negligence in Alabama, the plaintiff must prove (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015).

The ADOC and St. Clair Officials argue that they owed Mr. Wilson no duty under Alabama tort law; and all Defendants argue that Mr. Wilson has failed to allege facts sufficiently showing proximate causation. (Doc. 53 at 15). The court disagrees on both accounts.

## a. Duty

The Alabama Supreme Court has stated that "prison officials have a duty to exercise ordinary and reasonable care for the protection of persons in their custody." *Patton v. Thompson*, 958 So. 2d 303, 310 (Ala. 2006). Mr. Wilson was in Defendants' custody when Mr. Lawyer attacked him, and their failure to correct the known dangers at St. Clair made Mr. Wilson a foreseeable victim of harm. So the court finds that Defendants owed Mr. Wilson a duty of care for reasonable protection.

The ADOC and St. Clair Officials argue that Mr. Wilson fails to allege duty "under a theory of *respondeat superior*" because the proper target of that claim is ADOC, rather than the Officials. (Doc. 45 at 30). The Officials cite a nonbinding case providing that "Alabama law recognizes a cause of action for *negligent*

*training or supervision* only against an alleged tortfeasor's employer." *Osborne v. Cheatham*, No. 2:13-cv-1991-SGC, 2015 WL 9805823, *6 (N.D. Ala. Sept. 30, 2015) (emphasis added). But Mr. Wilson has alleged that the Officials' *own* decisions produced the conditions that led to his injuries—not their negligent hiring or supervision, as in *Osborne*. So his claims do not rely on the *respondeat superior* theory to establish the Officials' duty to Mr. Wilson.

Equally unavailing is the ADOC Officials' passing argument that Mr. Wilson's negligence claim "largely relies on the ADOC Officials' job descriptions." (Doc. 52 at 9). Mr. Wilson alleges specific policy decisions by the ADOC Officials whereby they failed to correct known security concerns, such as the unenforced controlled movement directive and the dangerous hot bay system. These allegations address the ADOC Officials' decisional failures, rather than merely pointing to their job descriptions.

### b. Proximate Causation

As explained below, the court finds that Mr. Wilson sufficiently alleges proximate causation as to all Defendants.

Defendants argue that they "did not proximately cause Plaintiff's injury because Mr. Lawyer's surprise attack was an intervening, unforeseeable event." (Doc. 53 at 15) (citing *Shannon v. Smith*, 309 So. 3d 144, 145 (Ala. 2020)). Under Alabama law, "if an intervening cause could have reasonably been foreseen at the

time the tortfeasor acted, it does not break the chain of causation. . . . Conversely, if the intervening cause was unforeseeable, the causal chain is broken." *Haddan v. Norfolk S. R. Comp.*, -- So. 3d --, 2022 WL 333879, *3 (Ala. 2022) (quotation omitted).

Despite Mr. Lawyer's "surprise attack," the court finds proximate causation for the same reasons that it found causation in the Eighth Amendment analysis above. *See McElligott*, 182 F.3d at 1254 (stating that deliberate indifference requires "conduct that is more than mere negligence"); *D.S. v. Dunn*, 2022 WL 1785262, at *12 ("For the same reasons Plaintiff has adequately stated his failure to protect claim, he has also stated a plausible negligence claim."). Mr. Lawyer's attack on Mr. Wilson did not occur in isolation. The Officials' alleged failure to correct the many dangerous conditions at St. Clair produced the circumstances that gave rise to the attack; likewise, the Guards' failure to follow prison policy and keep another dangerous inmate out of Mr. Wilson's cell directly led to his injuries. This conduct did not only make inmate-on-inmate attacks "foreseeable"; it resulted in *weekly* attacks at St. Clair. In the dangerous circumstances alleged at St. Clair and in particular in the P and Q blocks, that an inmate allowed access to another sleeping inmate's cell could violently attack him was reasonably foreseeable. So in these perpetually violent conditions, a "surprise attack" does not break the chain of causation. Even though Mr. Lawyer acted on his own volition, the court does not

find that event to be an "intervening cause" because the dangerous conditions that the Defendants permitted gave rise to frequent inmate attacks like the one Mr. Wilson suffered. *See Haddan*, 2022 WL 333879, at *3.

Relatedly, the St. Clair Guards argue that they could not reasonably foresee "that Mr. Lawyer would enter Plaintiff's cell and attack him." (Doc. 45 at 31). To be sure, Mr. Wilson does not allege that the Guards knew that Mr. Lawyer posed a particular risk to him. But they did know about the dangerous conditions and regular inmate-on-inmate violence in Q block. Their failure to secure Mr. Wilson's cell while he slept, coupled with that knowledge, makes an attack on Mr. Wilson reasonably foreseeable because they left him vulnerable to known violent conditions. So the court finds Mr. Wilson's negligence claim against the St. Clair Guards plausible for the same reasons it found Mr. Wilson's Eighth Amendment claim against them plausible.

Because no state-law immunity defenses shield the Defendants from Mr. Wilson's negligence claims, and because Mr. Wilson plausibly alleges those claims, the court will deny Defendants' motion to dismiss the negligence claims.

## IV.   <u>CONCLUSION</u>

For the reasons explained above, the court will enter a contemporaneous order denying the Defendants' motions to dismiss.

**DONE** and **ORDERED** this 28th day of July, 2022.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE